# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

U-NEST HOLDINGS, INC.                    :
                                         :
                    Plaintiff            :
                                         :
          v.                             :        C.A. No.
                                         :
ASCENSUS COLLEGE SAVINGS                 :
RECORDKEEPING SERVICES, LLC              :
                                         :
                    Defendant            :

**DECLARATION OF KSENIA YUDINA, CFA, MBA IN SUPPORT OF PLAINTIFF
U-NEST HOLDINGS, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

I, Ksenia Yudina, CFA, MBA, do declare and state:

1.     I make this declaration in support of the Motion for Preliminary Injunction of Plaintiff U-Nest Holdings, Inc. ("U-Nest").  I am the Chief Executive Officer of U-Nest and I have held this position at all times relevant to this action.  The information in this declaration is taken from my own personal knowledge.

2.     I make this declaration voluntarily.

3.     To the best of my knowledge, U-Nest offers the only mobile application for iPhone that allows end-user account holders to save for their children's education via a tax-advantaged 529 college savings plan.

4.     U-Nest is not just a mobile app, however; U-Nest serves as financial advisor to its end users who open accounts with a 529 qualified savings plan with respect to those investments.

5.     More specifically, U-Nest's end-user account holders sign an agreement when they contract to use U-Nest's services that provides U-Nest with a limited power of attorney ("POA") and appoints U-Nest as their Financial Advisor, attorney-in-fact and agent to

interface with 529 plans such as the Rhode Island 529 CollegeBound savings program ("RI Program").

6.   A true and accurate copy of the form of POA signed by U-Nest's clients is attached as Exhibit C-1.

7.   U-Nest, through myself and others, began completing the necessary forms in connection with the rollover process for its RI Program accounts on Friday, November 29 (the day after Thanksgiving) in order to meet the December 31 deadline to exit its accounts from the RI Program as set forth in the settlement agreement entered into between Ascensus College Savings Recordkeeping Services, LLC ("Ascensus") and Invesco, and U-Nest on November 27, 2019 (the "*Settlement Agreement*").

8.   U-Nest (through me) also contacted Invesco Distributors, Inc. ("Invesco") (an individual named Ron Murphy) on November 29, 2019 regarding the rollover process to try to make it as smooth as possible.  A true and accurate copy of this correspondence is attached hereto as Exhibit C-2.

9.   Invesco referred U-Nest to Ascensus for help with the rollover process.  *See* Exh. C-2.

10.   Because I knew of no individual at Ascensus who could assist with the rollover process, I asked U-Nest's counsel to seek advice from counsel to Ascensus on who to contact.

11.   Just hours after Ascensus unilaterally canceled the noon ET December 6, 2019 phone call with U-Nest to discuss the rollover process, U-Nest (through myself) received a phone call from JPMorgan Asset Management ("JPM"), specifically, a Mr. Todd Grathouse, who stated to me that (1) U-Nest would no longer be allowed to rollover RI accounts into the 529 savings plan in New York (the "NY Program"), (2) that all of U-Nest's current

- 2 -

accounts were being "frozen," and (3) that U-Nest's selling agreement with the NY Program would be terminated (the "NY Termination Call").

12. During the NY Termination Call, JPM informed me that the termination resulted from a concern that U-Nest was "high risk".

13. I promptly (the following business day, Monday, December 9) provided information to JPM demonstrating that U-Nest did not present any risk, including a full response to minor issues raised previously concerning a small handful of U-Nest accounts. A true and accurate copy of my December 9, 2019 correspondence to JPM is attached hereto as Exhibit C-3.

14. In light of that information, I then asked JPM to reconsider its termination of U-Nest in NY, but JPM declined to do so. *See* Exh. C-3.

15. I later received final notice from JPM that such termination would be effective January 6, 2020.

16. A true and accurate copy of the final notice that U-Nest received from JPM is attached hereto as Exhibit C-4.

17. The circumstances surrounding the timing and substance of the NY Termination Call confirm to me that Ascensus had communicated with JPM that U-Nest was "high risk" (or a materially similar phrase) and orchestrated that U-Nest be terminated from NY.

18. The "communication" that was cryptically referenced in Ascensus counsel's December 6 email cancelling the scheduled December 6 phone call (forwarded to me by U-Nest's counsel) was the NY Termination Call that happened later that same day; Ascensus has never denied this.

- 3 -

19.     Further, to the best of my knowledge, only Ascensus could have accused U-Nest of being "risky" to JPM; this is evident in large part because Ascensus, not JPM, processes all account paperwork in connection with the NY Program and JPM would not and could not have drawn this conclusion without input from Ascensus.

20.     Ascensus describes its role in the NY Program as "program manager," on a web page called "*Advisor Guided College Savings Program*," which is located on the following web site regarding the NY Program: https://www.ny529advisor.com/home.

21.     A true and accurate copy of the web page in which Ascensus describes its role in the NY Program is attached hereto as Exhibit C-4.

22.     Further, I received four phone calls from the processing team that handles the NY Program – not JPM – regarding alleged "issues" concerning certain third party banks identified on U-Nest accounts opened in the NY Program shortly (within hours) after the *Settlement Agreement* was signed in November, further confirming to me Ascensus' complicity in the NY Termination Call.

23.     Because Ascensus is the manager for the 529 college savings plan in both RI and NY, Ascensus should have known when entering into the *Settlement Agreement* that U-Nest also had a selling agreement with JPM in connection with the NY Program.

24.     Ascensus never called or corresponded with me or anyone else associated with U-Nest about the termination of U-Nest from the NY Program.

25.     It is my opinion that Ascensus misled U-Nest over the course of approximately a week (leading up to the filing of this lawsuit) that Ascensus was sincerely considering a business resolution to this dispute, when all circumstances suggest that Ascensus was just stringing U-Nest along to try and "run out the clock" on U-Nest under the *Settlement Agreement*.

- 4 -

26. The Securities and Exchange Commission (SEC), by letter dated February 11, 2019, notified U-Nest that it was under a standard, ordinary course "limited scope examination" in order to "better understand [U-Nest's] business activities", and requested extensive documents and data in connection therewith, all of which U-Nest complied with.

27. The SEC conducted a thorough "Examination", or audit, of U-Nest during that time (February through May), culminating on May 29, 2019.

28. By letter also dated May 29, 2019, the SEC requested corrective action on five "deficiencies" identified during the Examination (providing 30 days to comply).

29. A true and accurate copy of the SEC's May 29 letter is attached hereto as Exhibit C-5.

30. On June 27, 2019, U-Nest provided thorough written responses to the SEC's May 29 letter.

31. A true and accurate copy of U-Nest's responses to the SEC's May 29 letter are attached hereto as Exhibit C-6.

32. U-Nest (through me) had a subsequent closing call with the SEC in July 2019 to review U-Nest's June 27, 2019 letter, and was confirmed by the SEC to me during that phone call to have resolved all deficiencies, and as a result, the SEC cleared U-Nest.

33. Ascensus has claimed that U-Nest is "risky" because of minor issues it claims exists with a small number of U-Nest accounts, things like a maiden name being used, or a third party bank being referenced, or a social security number being entered incorrectly; these are minor errors that occur in the ordinary course of opening accounts and, in any event, U-Nest has successfully addressed and resolved all such concerns on every single one of such accounts.

34. I am U-Nest's founder, and I am a mother of three. U-Nest has less than 10 employees, and is still in its "start-up" phase.

- 5 -

35.     U-Nest was recently profiled favorably by Forbes Magazine.

36.     A true and accurate copy of the Forbes profile of U-Nest is attached hereto as Exhibit C-7.

37.     After reviewing the 529 college savings plans of all 50 states, U-Nest chose the RI Program as one of two plans to primarily recommend to its end user advisory clients (the other being the NY Program) based on the caliber of the Program and improvements that resulted under the leadership of the Honorable General Treasurer Magaziner.

38.     U-Nest currently only operates on the iPhone platform and has launched an application for Android platforms as well, but cannot offer the Android access to clients due to this ongoing dispute with Ascensus.

39.     U-Nest does not currently have a selling agreement with a 529 college savings plan in any other Ascensus-managed state.

40.     While U-Nest does have selling agreements with two states not managed by Ascensus, U-Nest cannot use those plans for its RI Program accounts due to technical limitations associated with the managers of those plans.

41.     In other words, it is not technologically feasible for U-Nest to successfully establish a selling agreement in a non-Ascensus-managed state to which to roll over its RI Program accounts without at least six months' lead time to do so.

42.     Under the *Settlement Agreement*, U-Nest accepted a shorter time to accomplish the rollovers – approximately one month's time – because it would have been feasible to do that when the state accepting the rollovers (NY) was also an Ascensus-managed and Ascensus-platform state.

43.     Now that Ascensus has (based on the facts available to me) taken steps to block U-Nest's access to the NY Program, the circumstances under which U-Nest settled the litigation

- 6 -

initiated by its *Verified Complaint and Motion for Temporary Restraining Order* against Ascensus and Invesco in the Superior Court of Rhode Island, civil case number PC-2019-11342 (the "*Original Action*"), have been drastically changed.

44. If U-Nest's access to its 500+ RI Program accounts is allowed to terminate under the Agreement without recourse from this Court, these customers will, without warning, lose the special access to their accounts afforded to them by U-Nest's mobile application (for which they have contracted).

45. In addition, U-Nest's customers will lose their financial advisor, and neither Invesco nor JP Morgan provides direct-sold plans (their plans are only offered through financial advisors). In addition to convenience, the clients require special guidance and help answering their 529 plan related questions, and they will lose these services if U-Nest's advisor access is terminated by Ascensus. I am of the opinion that such an event may subject U-Nest, Invesco and Ascensus to a class action lawsuit.

46. As a result, each of those families – the clients of U-Nest – will face considerable confusion regarding the status of those accounts and the money they have already invested therein.

47. At a minimum, it is highly likely to result in a loss of confidence in U-Nest by both its current end user clients and prospective clients, and substantial negative press against U-Nest.

48. Given U-Nest's status as a small and growing company, such an event could result in U-Nest's inability to continue to conduct business, and the loss of an innovative idea from a market that is in my opinion dominated by old thinking and in need of such innovation.

49.    In light of the foregoing impact, U-Nest and its clients are left with no alternative but to

seek relief from the *Settlement Agreement* in this Court.

50.    I declare under the pain and penalty of perjury that the foregoing is true and correct.


Executed on December 19, 2019                        _____

                                                     KSENIA YUDINA, CFA, MBA


- 8 -

# Exhibit C-1





# Advisor Agreement

## Terms and Conditions

This agreement covers our relationship with you. In addition to setting out the terms by which we provide advisory services to you, it also sets out the terms and conditions applicable to your use of our Sites (as defined below). Your electronic signature (hereafter referred to as an "E-signature") to this agreement constitutes your agreement to contract with U-Nest Holdings Inc., which operates under the tradename uNest, under the following terms and conditions.

For purposes of this Agreement, "you" or "your" refers to the person who has signed this Agreement under the person's own name electronically, i.e., the person opening a college funding account ("Account") for the benefit of a future student ("Student"). You, the person(s) who has signed this Agreement, is our investment advisory client. Nobody else, e.g., the Student or any person who contributes money to the Account other than you (a "Contributor"), is our client. "We," "us," "our" uNest" refers to U-Nest Holdings, Inc. an internet investment adviser registered with the Securities and Exchange Commission.

This Agreement provides us with a limited power of attorney and appoints uNest as your attorney-in-fact and agent, to access and provide your personal information to 529 Plans and their proper agents, and to retrieve and use your information with the full power and authority to do and perform each thing necessary in connection with such activities as if you were doing them personally. Among other valid things, this Agreement means we are authorized to receive confirmations and statements, initiate contributions, perform investment option changes, make qualified withdrawals, inquire, and have access to your Account. We will not be permitted to change the owner of the Account, and we will not be able to add, change or delete banking instructions, or to transfer assets out or roll assets out of your Account without your permission.

You consent to the electronic delivery of all documents and other information (including our Form ADV, Privacy Notice and any 529 Plan disclosure documents). You confirm that you have received our Form ADV Part 2A brochure and our Privacy Notice You understand that uNest does not provide tax, legal, or other professional guidance, and you should seek such advice prior to investing any money.

uNest provides non-discretionary investment advice. This means that you, rather than us, will select each investment. We provide investment advice exclusively through our interactive website, currently located at unestapp.com, the terms and conditions applicable to its use are set out below. You confirm that you do not need, require or desire in-person or other personal investment advice. Our investment advice will be based on the personal information you provide to us through our website. We do not provide any investment advice through other means.

You acknowledge that uNest provides investment advice on only one or certain 529 Plans, and on only certain of the investment options available in those 529 Plans. These choices, which we refer to as "Investment Choices," are listed on our website. uNest is assisting you saving and investing on behalf of a Student, rather than on seeking investment returns generally. Therefore, uNest's investment advice will not, and is not intended to, meet your investment objectives, or the objectives of the Student or any Contributor.

You represent that, upon selecting an investment, you will complete any documentation that the investment requires, which currently requires that you provide your name, a U.S. permanent street address, and date of birth, among other things, that will be used to verify your identity.

UNest uses Plaid for bank authorization. Banking credentials are never made accessible to UNest. Plaid takes deliberate steps designed to protect end user information in their possession. These steps include maintaining information security controls such as data encryption, firewalls, logical and physical access controls, and continuous monitoring. These controls are regularly evaluated for effectiveness against industry standards internally and by independent security auditors. (More resources on the security and privacy policies with Plaid: https://plaid.com/security/  https://plaid.com/legal/). You authorize uNest to use account and routing numbers obtained by Plaid, as required on enrollment forms, to open your 529 account. Use may vary by 529 Plan and can be transferred to the enrollment form as needed in either physical or digital form.

We may change our technologies and support services in our discretion at any time. We may change the Investment Choices, or reduce or expand the Investment Choices available, in our discretion from time to time. We reserve the right to implement a minimum investment or a minimum balance in our discretion. In the instance that uNest changes the Investment Choices, you consent to the use of your E-signature on any forms needed for such changes.

By signing this Agreement,

1. You confirm that the information provided to us in the Account opening process is accurate, and you agree to update us promptly when the information changes;

2. You agree to use our services only for lawful purposes;

3. You agree to provide us with a limited power of attorney;

4. You agree that the Account will be invested in the CollegeBound 529 Program maintained by the State of Rhode Island; and

5. You agree to the additional representations, warranties and agreements set forth on Exhibit A hereto.

**Fees**. uNest charges a monthly fee (i.e., service fees) for its services, including the personal use of the uNest web or mobile application. This fee is $3 per month; provided that uNest reserves the right to increase this fee on 30 days' notice. The fee includes advisory services, execution, and account reporting. The fee will be collected by the same method of payment that you selected for your investment contributions to the Account. At it's sole discretion, uNest may forfeit the advisory fee for a period of time specified in the promotional materials.

In addition to uNest's fees, your Account is subject to any distribution or transaction fees charged by a 529 Plan or intermediary, the 529 Plan's fees and expenses, and the Investment Choices' fees and expenses, and that those fees and expenses are generally disclosed in their disclosure documents. You understand that, even though uNest does not receive those fees and expenses, the Account's investment returns will be reduced by this double-layering of fees.

**Limitation of liability and indemnification**. uNest, its personnel, its service providers, and its agents shall not be liable to you for any error of judgment or mistake of law or for any loss arising out of any investment or for any act or omission in advising or administering the Account or the performance uNest's duties under this Agreement, except for willful misfeasance, bad faith, or gross negligence in its performance of its duties and obligations under this Agreement. In no event shall uNest be responsible or liable, whether in contract, warranty, tort (including negligence), or otherwise, for any indirect, special, incidental, exemplary, liquidated, or punitive damages. To the extent permitted by law, uNest's liability shall be limited to fees actually received from the account. **Notwithstanding the foregoing, nothing contained in this paragraph or elsewhere in this Agreement shall constitute a waiver by you of any of your legal rights under applicable U.S. federal securities laws or any other laws whose applicability is not permitted to be contractually waived.** We have no liability for events beyond our control. The Account should be considered a long-term investment, and changes to the Account (such as choosing different Investment Choices) should not be expected to be implemented on any particular timing, even if market events or other occurrences suggest urgency.

You agree that you will, or you will cause the Account to, indemnify uNest, its personnel, its affiliates, its service providers, and its agents, for and to hold them harmless from any loss, claim, or dispute that may arise out of any inaccurate personal or other information that you have provided uNest in connection with this Agreement, during the Account opening process, in updating the Account information; out of any action relating to any tax liabilities to which the Account may become subject; and out of any damage to our website or otherwise due to malware, viruses, cybersecurity breaches, or other harm arising due to your accessing or using of the website.

**Confidentiality**. uNest and you each agree that all information and advice furnished by either party to the other pursuant to this Agreement shall remain confidential and shall not be disclosed to any third parties except as otherwise provided in our Privacy Policy Notice, as agreed in writing by us and you, or as may be permitted or required by law.

**Intellectual Property**. The contents of the Sites, including text, logos, and images, our software, our processes, our business methods, and all of our other materials that may constitute intellectual property are our property, and are protected under national and international copyright, trademark, and other laws.

**Amendments to this Agreement**. By giving you 30 days' notice and effective beginning at the end of that 30 day period, we may amend this Agreement in any way, except to change the investment advisory fee structure or if we determine in our fiduciary duty that you, the Student, or the Account would be materially adversely affected by the amendment (unless we determine that the amendment is required for compliance with law). Any other amendments will only take effect upon your and our mutual agreement.

**Assignment**. Neither uNest nor you may assign this Agreement (as "assignment" is defined for purposes of the Investment Advisers Act of 1940) without the prior consent of the other party. In the event of an assignment of this Agreement by uNest, or a deemed assignment due to a change in control of uNest, uNest agrees to provide at least 30 days' notice to you, and you agree that, if you continue to accept services under this Agreement after such notice, that shall constitute your consent to the assignment for all purposes.

**Governing law and arbitration**. This Agreement will be governed by and interpreted in accordance with the laws of the State of California. To the extent permitted by law, any controversy under this Agreement shall be determined by arbitration, in accordance with the rules of the American Arbitration Association.

**Miscellaneous**. The enforceability or validity of any section, paragraph or provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement. A party's failure to insist at any time on strict compliance with this Agreement or with any of the terms of the Agreement or any continued course of such conduct on its part will not constitute a waiver by it of any of its rights or privileges.

**Termination**. uNest may immediately terminate this Agreement at any time by emailing you written notice or by other appropriate means of notice. You may terminate this Agreement without penalty upon 60 days' written notice to us, with effect at quarter end, unless otherwise agreed by uNest. If termination is effective on a date other than month end and if uNest has been paid its investment advisory fee in advance, uNest shall refund any portion of its investment advisory fee to which it was not entitled, as calculated by us in good faith based on the pro rata portion of the month during which it provided services. For any

investment advisory fee that remains owing, uNest is entitled to invoice you, and you agree to promptly pay the invoiced amount in full. After termination of this Agreement takes effect, the Contributors, the Student, and the Account will lose access to our technology solutions that support investments by family and friends.

**Survival**. The following provisions shall survive termination of this Agreement: "Limitation of liability and indemnification" and "Termination.

# PLEASE READ THESE TERMS AND CONDITIONS OF USE CAREFULLY.

BY USING THE WEBSITE LOCATED AT UNEST.COM, AS WELL AS ANY SUBDOMAINS THEREOF AND THE RELATED MOBILE WEBSITE (COLLECTIVELY, THE "SERVICE"), YOU AGREE TO BE BOUND BY THE FOLLOWING, WHETHER OR NOT YOU BECOME A CLIENT OF UNEST.

These terms and conditions of use apply solely to your access to, and use of, the web sites or mobile applications of uNest ("uNest" "we" or "our"), located at www.unestapp.com and any other sites or mobile applications operated by uNest that link to these Site Terms (the "Sites").

uNest reserves the right to change or modify any of these Site Terms or any policy or guideline of the Sites, at any time and in its sole discretion. If uNest makes changes to these Site Terms, we will provide notice of such changes, such as by posting a notice on the Sites or updating the "Last Updated" date above. Your continued use of our Sites following the posting of changes or modifications will confirm your acceptance of such changes or modifications. Therefore, you should frequently review the Site Terms and applicable policies whenever you access the Sites and at least every thirty (30) days to make sure that you understand the terms and conditions that will apply to you and your use of the Sites. If you do not agree to the amended terms, you must stop using the Sites.

**Copyright and Limited License**. Unless otherwise indicated in the Sites, the Sites and all content and other materials on the Sites, including, without limitation, the uNest logo, and all designs, text, graphics, pictures, information, data, software, sound files, other files and the selection and arrangement thereof (collectively, the "Site Materials") are the proprietary property of uNest or our licensors or users and are protected by U.S. and international copyright laws.

You are granted a limited, non-sublicensable license to access and use the Sites and electronically copy, (except where prohibited without a license) and print to hard copy portions of the Site Materials for your informational, non-commercial and personal use only. Such license is subject to these Site Terms and does not include: (a) any resale or commercial use of the Sites or the Site Materials therein; (b) the distribution, public performance or public display of any Site Materials; (c) modifying or otherwise making any derivative uses of the Sites and the Site Materials, or any portion thereof; (d) use of any data mining, robots or similar data gathering or extraction methods; (e) downloading (other than the page caching) of any portion of the Sites, the Site Materials or any information contained therein, except as expressly permitted on the Sites; or (f) any use of the Sites or the Site Materials other than for its intended purpose.

Any use of the Sites or the Site Materials other than as specifically authorized herein, without the prior written permission of uNest, is strictly prohibited and will terminate the license granted herein. Such unauthorized use may also violate applicable laws including without limitation copyright and trademark laws and applicable communications regulations and statutes. Unless explicitly stated herein, nothing in these Site Terms shall be construed as conferring any license to intellectual property rights, whether by estoppel, implication or otherwise. This license is revocable at any time.

**Repeat Infringer Policy**. In accordance with the Digital Millennium Copyright Act ("DMCA") and other applicable law, uNest has adopted a policy of terminating, in appropriate circumstances and at uNest's sole discretion, subscribers or account holders who are deemed to be repeat infringers. uNest may also at its sole discretion limit access to the Sites and/or terminate the accounts of any users who infringe any intellectual property rights of others, whether or not there is any repeat infringement.

**Copyright Complaints**. If you believe that anything on the Sites infringes upon any copyright which you own or control you may file a notification of such infringement with our Designated Agent. Please see 17 U.S.C. §512(c)(3) for the requirements of a proper notification. You should note that if you knowingly misrepresent in your notification that the material or activity is infringing, you will be liable for any damages, including costs and attorneys' fees, incurred by uNest or the alleged infringer as the result of our relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing.

**Trademarks**. The uNest logo and any other product or service name or slogan contained in the Sites are trademarks of uNest and its suppliers or licensors, and may not be copied, imitated or used, in whole or in part, without the prior written permission of uNest or the applicable trademark holder. You may not use any metatags or any other "hidden text" utilizing "uNest" or any other name, trademark or product or service name of uNest without our prior written permission. In addition, the look and feel of the Sites, including all page headers, custom graphics, button icons and scripts, is the service mark, trademark and/or trade dress of uNest and may not be copied, imitated or used, in whole or in part, without our prior written permission. All other trademarks, registered trademarks, product names and company names or logos mentioned in the Sites are the property of their respective owners. Reference to any products, services, processes or other information, by trade name, trademark, manufacturer, supplier or otherwise does not constitute or imply endorsement, sponsorship or recommendation thereof by uNest.

**Hyperlinks**. You are granted a limited, non-exclusive right to create a text hyperlink to the Sites for noncommercial purposes, provided such link does not portray uNest or any of its products and services in a false, misleading, derogatory or otherwise defamatory manner and provided further that the linking site does not contain any adult or illegal material or any material that is offensive, harassing or otherwise objectionable. This limited right may be revoked at any time. You may not use a uNest logo or

other proprietary graphic of uNest to link to this Sites without the express written permission of uNest. Further, you may not use, frame or utilize framing techniques to enclose any uNest trademark, logo or other proprietary information, including the images found at the Sites, the content of any text or the layout/design of any page or form contained on a page on the Sites without uNest's express written consent. Except as noted above, you are not conveyed any right or license by implication, estoppel or otherwise in or under any patent, trademark, copyright or proprietary right of uNest or any third party.

uNest makes no claim or representation regarding, and accepts no responsibility for, the quality, content, nature or reliability of third-party Web sites accessible by hyperlink from the Sites, or Web sites linking to the Sites. Such sites are not under the control of uNest and uNest is not responsible for the contents of any linked site or any link contained in a linked site, or any review, changes or updates to such sites. uNest provides these links to you only as a convenience, and the inclusion of any link does not imply affiliation, endorsement or adoption by uNest of any site or any information contained therein.

**Third Party Content; No Endorsement of uNest by Third Parties.** uNest may provide third party content on the Sites and may provide links to Web pages and content of third parties (collectively, "Third Party Content") as a service to those interested in this information. uNest does not control, endorse or adopt any Third Party Content and makes no representation or warranties of any kind regarding the Third Party Content, including without limitation regarding its accuracy or completeness. You acknowledge and agree that uNest is not responsible or liable in any manner for any Third Party Content and undertakes no responsibility to update or review any Third Party Content. Users use such Third Party Content contained therein at their own risk. Third parties who are identified on the Sites do not sponsor, endorse or promote uNest or uNest's business. Third parties and their documentation, whether available by link via the Sites or otherwise, may contain intellectual property of such third parties which is protected by applicable law.

**Third-Party Products and Services.** uNest may provide or allow users to provide information about or links to third-party products or services on the Sites. Your business dealings or correspondence with, or participation in promotions of, such third parties, and any terms, conditions, warranties or representations associated with such dealings or promotions, are solely between you and such third party. uNest is not responsible or liable for any loss or damage of any sort incurred as the result of any such dealings or promotions or as the result of the presence of such non- uNest advertisers or third party information on the Sites.

**Feedback.** You acknowledge and agree that any questions, comments, suggestions, feedback, ideas, plans, notes, drawings, original or creative materials or other information or materials regarding the Sites, uNest or uNest's general products or services (but excluding any client information) (the "Feedback") that are provided by you in the form of email or other submissions to uNest, or any postings on the Sites, are (as between you and uNest) non- confidential and shall become the sole property of uNest. uNest shall own, and you hereby assign to uNest, all exclusive rights, including all intellectual property rights, and shall be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

**User Content and Interactive Services or Areas.** The Sites may include interactive areas or services ("Interactive Areas"), such as forums, chat rooms or message boards, online hosting or storage services, or other areas or services in which you or other users create, post or store any content, messages, materials, data, information, text, music, sound, photos, video, graphics, applications, code or other items or materials on the Sites ("User Content"). You are solely responsible for your use of such Interactive Areas and use them at your own risk. By using any Interactive Areas, you agree not to post, upload to, transmit, distribute, store, create or otherwise publish through the Sites any User Content that (i) is unlawful, libelous, defamatory, obscene, indecent, lewd, suggestive, harassing, threatening, invasive of privacy or publicity rights, abusive, inflammatory, fraudulent or otherwise objectionable; (ii) that would constitute, encourage or provide instructions for a criminal offense, violate the rights of any party, or that would otherwise create liability or violate any local, state, national or international law; (iii) that may infringe any patent, trademark, trade secret, copyright or other intellectual or proprietary right of any party. By posting any User Content, you represent and warrant that you have the lawful right to distribute and reproduce such User Content; (iv) that impersonates any person or entity or otherwise misrepresents your affiliation with a person or entity; (v) that constitutes (a) unsolicited promotions, political campaigning, advertising or solicitations; (b) private information of any third party, including, without limitation, addresses, phone numbers, email addresses, Social Security numbers and credit card numbers; or (c) viruses, corrupted data or other harmful, disruptive or destructive files; and (vi) that, in the sole judgment of uNest, is objectionable or which restricts or inhibits any other person from using or enjoying the Interactive Areas or the Sites, or which may expose uNest or its users to any harm or liability of any type.

You further agree that you are solely responsible for your conduct while on the Sites, and you agree that you will not do any of the following in connection with the Site or its users: (i) use the Site or the Service in any manner that could interfere with, disrupt, negatively affect or inhibit other users from fully enjoying the Site or that could damage, disable, overburden or impair the functioning of the Site in any manner; (ii) impersonate or post on behalf or any person or entity or otherwise misrepresent your affiliation with a person or entity; (iii) cheat or utilize unauthorized exploits in connection with the Service; (iv) stalk, intimidate, threaten, or otherwise harass or cause discomfort to other users; (v) send any unsolicited commercial messages; (vi) use the Site or the Service for any illegal or unauthorized purpose or engage in, encourage, or promote any illegal activity, or any activity that violates these Terms of Use; or (vii) circumvent or attempt to circumvent any filtering, security measures or other features uNest may from time to time adopt to protect the Sites, its users or third parties.

uNest takes no responsibility and assumes no liability for any User Content posted, stored or uploaded by you or any third party, or for any loss or damage thereto, nor is uNest liable for any mistakes, defamation, slander, libel, omissions, falsehoods, obscenity, or profanity you may encounter. Your use of Interactive Areas is at your own risk. Enforcement of the user content or conduct rules set forth in these Site Terms is solely at uNest's discretion, and failure to enforce such rules in some instances

does not constitute a waiver of our right to enforce such rules in other instances. In addition, these rules do not create any private right of action on the part of any third party or any reasonable expectation that the Sites will not contain any content that is prohibited by such rules. As a provider of interactive services, uNest is not liable for any statements, representations or User Content provided by its users in any public forum, personal home page or other Interactive Area. Although uNest has no obligation to screen, edit or monitor any of the Content posted in any Interactive Area, uNest reserves the right, and has absolute discretion, to remove, screen or edit any User Content posted or stored on the Sites at any time and for any reason without notice, and you are solely responsible for creating backup copies of and replacing any User Content you post or store on the Sites at your sole cost and expense. Any use of the Interactive Areas or other portions of the Sites in violation of the foregoing violates these Site Terms and may result in, among other things, termination or suspension of your rights to use the Interactive Areas and/or the Sites.

If you post User Content to the Sites, unless we indicate otherwise, you grant uNest and its affiliates a nonexclusive, royalty-free, perpetual, irrevocable and fully sublicensable right to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform and display such User Content throughout the world in any media on or in connection with the Sites and the promotion thereof. You grant uNest and its affiliates and sublicensees the right to use the name that you submit in connection with such content, if we choose. You understand and agree that the use of your or other users name, likeness, voice or identity in connection with various features on the Sites does not imply any endorsement of such feature or of the Sites of uNest unless explicitly stated otherwise. You represent and warrant that (a) you own and control all of the rights to the User Content that you post or you otherwise have the right to post such User Content to the Sites; (b) the User Content is accurate and not misleading; and (c) use and posting of the User Content you supply does not violate these Site Terms and will not violate any rights of or cause injury to any person or entity.

**Registration Data**. Account Security. In consideration of your use of the Sites, you agree to (a) provide accurate, current and complete information about you as may be prompted by any registration forms on the Site ("Registration Data"); (b) maintain the security of your password and identification; (c) maintain and promptly update the Registration Data, and any other information you provide to uNest, to keep it accurate, current and complete; and (d) accept all risks of unauthorized access to the Registration Data and any other information you provide to uNest. You are responsible for maintaining the confidentiality of any account information, user names, logins, passwords, and security questions and answers that you use to access any page or feature on the Sites, and for logging off of your account and any protected areas of the Sites. Further, you are fully responsible for all activities occurring under your accounts, user names, logins, passwords, and security questions and answers that result from your negligence, carelessness, misconduct, or failure to use or maintain appropriate security measures. If you become aware of any suspicious or unauthorized conduct concerning your accounts, user names, logins, passwords, or security questions and answers, you agree to contact uNest immediately. uNest will not be liable for any loss or damage arising from your failure to comply with this paragraph.

**International use**. The investment advisory services referred to on the Sites are intended to be made available only to U.S. residents. The Sites are not to be a solicitation for or offering of any service or product to any person in any jurisdiction where such solicitation or offering would be illegal.

Because of the global nature of the Internet, you agree to comply with all local rules with respect to your account and your online conduct, including all laws, rules, codes, and regulations of the country in which you reside and the country from which you access the Sites, including without limitation, all laws, rules, codes, regulations, decrees, acts, orders, directives, legislation, bills, and statutes pertaining to tax, contracts, intellectual property, securities, e-commerce, banking, technology, computers, fraud, and privacy. In addition, you agree to comply with all applicable laws, rules, codes, and regulations regarding the transmission of technical data exported from the United States or cross-border transmission of data including under applicable data privacy laws.

**Disclaimer**. Except as expressly provided to the contrary in a writing by uNest, the sites, the site materials contained therein and the services provided on or in connection therewith (the "services") are provided on an "as is" basis without warranties of any kind, either express or implied. uNest disclaims all other warranties, express or implied, including, without limitation, implied warranties of merchantability, fitness for a particular purpose, title and non- infringement as to the sites and the services, including the information, content and materials contained therein. uNest does not represent or warrant that materials in the sites or the services are accurate, complete, reliable, current or error-free. uNest does not represent or warrant that the sites or its servers are free of viruses or other harmful components.

uNest is not responsible for typographical errors or omissions relating to pricing, text or photography. While uNest attempts to make your access and use of the sites and the services safe, uNest cannot and does not represent or warrant that the sites or its server(s) are free of viruses or other harmful components; therefore, you should use industry- recognized software to detect and disinfect viruses from any download.

**Modifications to the Sites**. uNest reserves the right to change any and all content contained in the Sites and to modify, suspend or discontinue the Sites or any Services offered through the Sites or any features or functionality of the Sites or the Services at any time without notice and without obligation or liability to you.

**Termination**. Notwithstanding any of these Site Terms, uNest reserves the right, without notice and in its sole discretion, to terminate your license to use the Sites, and to block or prevent future your access to and use of the Sites.

**Severability**. If any provision of these Site Terms shall be deemed unlawful, void or for any reason unenforceable, then that provision shall be deemed severable from these Site Terms and shall not affect the validity and enforceability of any remaining

provisions.

## Search the site

Search

### Recent Posts

- How to Start Saving for a College Savings Account
- Coverdell ESA vs 529 Plan: Which One to Choose?
- 6 Steps to Opening a 529 College Savings Plan
- REAL PEOPLE ASKING QUESTIONS
- Myths vs Truths

## Recent Comments

## Archives

- December 2019
- November 2019
- October 2019
- June 2019
- May 2019
- April 2019
- March 2019
- February 2019
- January 2019
- December 2018
- November 2018
- October 2018
- September 2018
- August 2018
- July 2018

## Categories

- 529 Plan
- 529 Plan
- College
- College
- College Savings
- College Tuition
- Education
- Families of U-Nest
- Parenting
- U-Nest

## GET FREE WEEKLY UPDATES

College tuition is expensive. Knowledge is free. Get the latest tips and tricks to ensure you can afford college for your child.

Enter your email here

☐ I consent to my submitted data being collected via this form*

SIGN UP NOW

We respect your privacy and take protecting it seriously.

## SOCIAL LINKS

Home                                FAQs

Features                            Blog

Pricing                             Contact Us

About Us                            Press

Download App                        Legal

                                    Important Disclosures

**Subscribe to our Newsletter**

Your Email                                          Subscribe

  

© 2018-2019 U-Nest Inc. All rights reserved.

This website is operated by U-Nest Inc., an SEC Registered Investment Advisor. U-Nest does not provide investment advice on investments that are guaranteed by a bank or otherwise, or that are FDIC-insured. Investing involves risk and investments may lose value. Please consider your objectives, 529 plan tax considerations, and U-Nest pricing before investing. Past performance does not guarantee future results. Investment outcomes and projections are hypothetical in nature. U-Nest does not provide brokerage services. To understand Calculation Methodology, refer to the Disclosure about College Savings Calculator. See U-Nest Brochure for additional information about risks.

# Exhibit C-2

**From:** Ksenia Yudina <ksenia.yudina@u-nest.com>
**Sent:** Friday, November 29, 2019 2:22 PM
**To:** Murphy, Ron <Ronald.Murphy@invesco.com>
**Cc:** Farside, Joseph <Joseph.Farside@lockelord.com>; Caplan, Matt <mcaplan@cooley.com>
**Subject:** CollegeBound 529 Rollovers

Hi Ron,

Hope you had a nice Thanksgiving. Since per our settlement agreement (attached), Invesco agreed to assist us in the timely and efficient rollovers of all existing clients to another 529 plan provider (paragraph 13), I have a few questions.

1. Who should be our main point of contact at Invesco to assist with this process?
2. How long do the rollovers typically take? Please describe the process in detail - when the check is issued, whether the account at Invesco is permanently closed, etc.
3. Please advise whether the Section 3 in the form below is filled out correctly:



I appreciate your assistance in this matter.

Kind regards,

**Ksenia Yudina, CFA**
Founder and CEO



U-Nest Holdings, Inc.

(310) 923-0363
ksenia.yudina@u-nest.com
www.u-nest.com

*Confidentiality Notice: This facsimile and or email  may contain confidential information.
The information is intended for the sole use of the individual or entity indicated above. If you are
not the intended recipient or an authorized agent, you are hereby notified that any disclosure, copying,
distribution or use of the information contained in this transmission is strictly prohibited. If you have
received this transmission in error, please notify the sender immediately by email and destroy
this transmission. Thank you.*

# Exhibit C-3

From: **Grathouse, Todd** <todd.grathouse@jpmorgan.com>
Date: Wed, Dec 11, 2019 at 7:57 AM
Subject: RE: U-Nest / Agreement with JPM For Registered Investment Advisers
To: Ksenia Yudina <ksenia.yudina@u-nest.com>
Cc: Peter Mansfield <peter@u-nest.com>

**Ksenia-**

**This is to acknowledge that JPMorgan received your email.  JPMorgan is terminating its selling agreement with U-Nest Holdings LLC as expressed in the phone call from Friday December 6th.  A termination notice was sent on Friday as indicated in the phone call.**

**When we stated that accounts would be frozen we were referring to not opening any new accounts nor accepting any new purchases or rollovers into the NY529 Advisor Guided Plan accounts.  The shareholders can redeem their accounts or roll them to a new plan, just not place additional purchases.**

**Thanks**

**Todd**

**From:** Ksenia Yudina [mailto:ksenia.yudina@u-nest.com]
**Sent:** Monday, December 09, 2019 4:04 PM
**To:** Grathouse, Todd (AM, USA) <todd.grathouse@jpmorgan.com>
**Cc:** Peter Mansfield <peter@u-nest.com>
**Subject:** U-Nest / Agreement with JPM For Registered Investment Advisers

Dear Todd,

I wanted, before too much more time passed, to send you a note regarding our discussion of last Friday.  We believe that Ascensus is taking actions to block U-Nest's growth and, more, to try and cut U-Nest out of the industry altogether.  This has become apparent to us after Ascensus took wrongful aggressive action against U-Nest in RI, and only days later, initiated similar action with respect to the NY plan.  These actions harm U-Nest, obviously, but they also harm the 529 plans that U-Nest has proven an ability to market to its end users, and most importantly it harms the end users who have opened accounts with the NY plan and appointed U-Nest as their financial advisor in connection with those accounts.

U-Nest greatly values its relationship with JPM.  As you may know, we are looking to work with JPM on several other initiatives (commercial banking, payment processing for gifting, FinLab accelerator) and have very strong business contacts in the SF office. U-Nest has no interest in being adverse to JPM for those reasons among others.  But we need to make you aware that it appears Ascensus is likely using JPM in its role as distributor of the NY plan to effectuate Ascensus' predatory activity against U-Nest. We believe Ascensus may have a couple of strong motivations for doing this, but are unable to discuss those now.

### Intro to U-Nest

In support of our background and overall approach, UNest has been lauded loudly in both business and consumer media for its positive impact on American families looking to save for their children's education. We would be happy to forward some examples of the positive press we have received. We also enjoy a 4.9 rating in the Apple app store. Several leading venture capital firms have invested in us to help endorse our solution. Simply put, parents also love UNest for how we make the 529 sign up process less complex. We have always strived to achieve this without compromising any aspect of the compliance or regulatory requirements.

### Summary of Pre-Existing Ascensus-U-Nest Dispute in RI

We are not sure that Ascensus has provided a complete set of facts to you about what has been going on between it and U-Nest, in particular recently in RI, which included litigation.  To provide more context for this situation, U-Nest had a selling agreement for the RI plan through the distributor there – Invesco.  Ascensus caused Invesco to terminate that selling agreement in November.  This became clear after U-Nest had to file a lawsuit against Ascensus in RI state court to block Invesco and Ascensus from turning off U-Nest's access to the 529 account portal, which would have harmed U-Nest's customers and, thus, U-Nest.  Ascensus refused to even talk to us until we sued them.  After we sued them, we signed an agreement with them, the result of which was that U-Nest began to roll its RI account holders into NY accounts.  This all occurred during the week before Thanksgiving, and we had been rolling over accounts pursuant to that agreement last week when you called me.

### Relationship of RI to NY Regarding Timing

Now, it appears that, because we were rolling over some of those RI plan accounts to NY, all while we were opening other new unique accounts in NY (approximately 70-80 new accounts just last week), Ascensus decided to now attack us in NY by telling JPM falsehoods and claiming that U-Nest is "high risk".  At no time in the RI lawsuit did Ascensus or Invesco make any credible assertion that U-Nest is high risk, or non-compliant with any applicable rule or regulation.  They cannot, as U-Nest has been audited by the SEC and deemed to be in full compliance.

### Termination of the JPM-U-Nest Agreement Not Necessary or Justified, Especially Because the Claimed Account Discrepancies Have a Simple and Benign Explanation, and Have Been Resolved

I am happy to provide more information on the above, or put you in touch with our counsel if you should want more detail from them.  But in the meantime, we ask you to please reconsider JPM's position regarding U-Nest's status under the selling agreement for the NY plan.  We first want you to remove the "freeze" on our accounts that you mentioned.  We simply do not see any support for that under the terms of our agreement.  The agreement says in section 9(c) that we are due at least 30 days' notice before that agreement can be terminated.  Even if you are intending to provide that notice, we don't see authority in that agreement for JPM to "freeze" our accounts during the interim time period.  That is simply not justified here.

To be a bit more specific, we can directly address the claimed issues we discussed on our phone call Friday.  They should be of no concern.  The number of accounts you received with mismatched bank account and account owner's name have a simple explanation:

1) It was a new requirement, only applicable to the NY 529, that the bank account and account owner's name need to match. As soon as our team learned this, we checked all accounts and stopped sending applications that didn't meet this criteria. We promptly reached out to each impacted client to obtain the correct information. We have a record of our correspondence if it would be useful. In RI, we had about 20 accounts with different bank account name/account owner names, and it was *never raised as an issue by Ascensus*.

2) Even in situations where you received accounts with mismatched bank name, there was a simple explanation for this based on the answers we received from our clients:
    a) Clients used their maiden name
    b) Clients used their spouse's bank account
    c) Clients used their parent's (the child's grandparent) bank account

There was no risk or fraud inherent in these accounts, as it may have been presented to you by Ascensus.

3) In a couple of cases where clients provided an incorrect SSN, it was due to a human error. This is typical in any financial application process. We acted promptly to reach out to those clients to obtain the correct SSN.

It is inconceivable that clients have a negative intention when providing the incorrect SSN, since they're not applying for credit, but rather opening a college savings account for their children.

4) We've been through the stringent SEC audit, and due diligence audits with venture capital funds. Our KYC procedures have been thoroughly reviewed, and we haven't been informed of any issues, or asked to undertake any corrective actions. If JPM has stronger KYC requirements, these should have been flagged to us, so U-Nest has sufficient time to correct our existing processes.

The volume of accounts that you've been receiving from us in the past week definitely exceeds the volume of accounts you would expect to receive from a typical financial advisor. In reality however, the percentage of accounts with 'flagged' issues was very limited and seemingly exaggerated by Ascensus.

It is telling that Ascensus is using such thin justification to call us "high risk" – there is no benefit to U-Nest to open fake accounts so that deposits can be made into those accounts.  In fact, our procedures to protect against fraud are all in compliance with the SEC.  Second, there are indemnity provisions in that agreement, and so should U-Nest incur losses here when it has done nothing wrong, JPM could be exposed to indemnify U-Nest.

Perhaps most importantly, we are the financial advisor regarding our end users' accounts with the NY plan. For that reason, we should continue to have access to the accounts we generated even if the selling agreement is terminated.  We are aware of no justification of why our financial advisor access should be terminated even if the selling agreement is terminated.

**Summary of Requested Action by JPM / Go Forward**

On U-Nest's behalf, I make the following requests and notices all of which seem to me to be very reasonable even from JPM's perspective:

1.   Please reconsider JPM's position with respect to terminating its selling agreement with U-Nest; we are happy to meet with you and go over this in detail, and show that there is no level of risk in connection with U-Nest (as summarized above) – the agreement should not be terminated

2.   Please unfreeze all of U-Nest's NY plan accounts, as we do not see any justification for such harsh action

   •   You indicated on our phone call that JPM would "freeze" U-Nest's accounts – can you please clarify what that means more precisely?  We owe duties and obligations to our end user account holders to make sure their access can be maintained, etc., in our capacity as their financial advisor in connection with the NY plan.

3.   We expect to be back in court against Ascensus in RI shortly, and so the least JPM could do is maintain the pre-termination status quo in order to allow us to obtain further direction from that court about what the next steps should be that would protect U-Nest's account holders, now that some of the NY account holders are rollovers from the RI plan

4.   U-Nest intends to continue opening new accounts in connection with the NY plan until either the termination of the agreement (if not abandoned) becomes final (which would be 30 days or so from now) or a court ruling otherwise impacts that timing

These requests are not exhaustive, but just what we would appreciate seeing from JPM in the next day or so.  We can have a more fulsome discussion at the appropriate time (i.e., we are reserving all of our rights).

We want none of this, and believe we can work this out to the satisfaction of all parties.  Please let me know if you would like to discuss this further.

Kind regards,

**Ksenia Yudina, CFA**
Founder and CEO

Error! Filename not specified. U-Nest Holdings, Inc.

4

(310) 923-0363
ksenia.yudina@u-nest.com
www.u-nest.com

*Confidentiality Notice: This facsimile and or email  may contain confidential information.*
*The information is intended for the sole use of the individual or entity indicated above. If you are*
*not the intended recipient or an authorized agent, you are hereby notified that any disclosure, copying,*
*distribution or use of the information contained in this transmission is strictly prohibited. If you have*
*received this transmission in error, please notify the sender immediately by email and destroy*
*this transmission. Thank you.*

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, viruses and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

# Exhibit C-4



December 6, 2019

U-Nest Holdings LLC
Attn: Ksenia Yudina
2920 West Olive Ave
Suite 105
Burbank, CA 91505-4546

**RE:    Termination of Qualified Tuition Plan Agreement for Registered Investment Advisers between
U-Nest Holdings LLC and JPMorgan Distribution Services, Inc. effective 8/6/2018**

Dear Ksenia Yudina,

This letter serves as formal notice of the termination of the Qualified Tuition Plan Agreement for
Registered Investment Advisers between U-Nest Holdings LLC and JPMorgan Distribution Services, Inc.
Per the notice period in the Agreement, this termination is effective January 5, 2020.

Sincerely,

JPMorgan Distribution Services, Inc.

1111 Polaris Parkway, Suite 1F, OH1-1019, Columbus, Ohio 43240
jpmorganfunds.com

JPMorgan Distribution Services, Inc.
J.P. Morgan Asset Management is the marketing name for the Asset Management subsidiaries of JPMorgan Chase & Co. and its affiliates worldwide.

# Exhibit C-5







# 529 plans have the potential to grow faster than taxable UGMA/UTMA accounts

Learn the tax and financial aid benefits.

LEARN MORE >

## View Account Information



Go to my account   >

Performance and pricing   >

Forms and literature   >

My investment options   >

Client accounts for advisors   >



## College Planning Essentials

What's happening with tuition, scholarships, loans and the job market for college graduates? Find out all of this and more with College Planning Essentials.

Learn more about how to save and invest >

Learn more about tuition >

Learn more about scholarships >

Learn more about loans >



►   0:00/1:53    ⇆   🔊   CC

### Strategies to Fund Your College Mission

September 12, 2019

Hear the latest from Michael Conrath, Head of Education Savings at JP Morgan Asset Management, about the three key ways to keep up with the rising cost of college.



## Income Tax Advantages: The power of tax-free growth

With the Advisor-Guided Plan, investment earnings compound on a tax-deferred basis, and qualified withdrawals are entirely free from federal and state income taxes. Watch your account grow more quickly than taxable investments earning the same returns.

Learn More >

## 529-RELATED INSIGHTS



**Balancing acts: Investing for college without sacrificing retirement**



Catching up on college savings



Financial aid myths and facts



## CONTACT US

### Phone
Investor Service Center: 1-800-774-2108

Advisor Service Center: 1-855-JPM-6657 (1-855-576-6657)

Service Center Hours: Monday through Friday, 8:00 a.m. to 7:00 p.m. EST

### Email
For general questions, please email us at ny.529advisor@jpmorgan.com. We will respond to you within one business day. For your protection, please do not include your account number, Social Security Number or other sensitive information in your email message.

### General correspondence
**Regular Mail:**
New York's 529 Advisor-Guided College Savings Program
P.O. Box 55498
Boston, MA 02205

**Overnight Mail:**
New York's 529 Advisor-Guided College Savings Program
95 Wells Avenue
Suite 155
Newton, MA 02459



J.P.Morgan
Asset Management

Privacy | New York State Privacy | Security | Disclosure Booklet | Contact Us

| INVESTMENTS ARE NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE |
| --- |

*Before you invest, consider whether your or the Beneficiary's home state offers any state tax or other state benefits such as financial aid, scholarship funds, and protection from creditors that are only available for investments in that state's qualified tuition program.*

The Comptroller of the State of New York and the New York State Higher Education Services Corporation are the Program Administrators and are responsible for implementing and administering New York's 529 Advisor-Guided College Savings Program (the "Advisor-Guided Plan"). Ascensus Broker Dealer Services, LLC serves as Program Manager for the Advisor-Guided Plan. Ascensus Broker Dealer Services, LLC and its affiliates have overall responsibility for the day-to-day operations of the Advisor-Guided Plan, including recordkeeping and administrative services. J.P. Morgan Investment Management Inc. serves as the Investment Manager. JPMorgan Distribution Services, Inc. markets and distributes the Advisor-Guided Plan. JPMorgan Distribution Services, Inc. is a member of FINRA.

No guarantee: None of the State of New York, its agencies, the Federal Deposit Insurance Corporation, J.P. Morgan Investment Management Inc., Ascensus Broker Dealer Services, LLC, JPMorgan Distribution Services, Inc., nor any of their applicable affiliates insures accounts or guarantees the principal deposited therein or any investment returns on any account or investment portfolio.

New York's 529 College Savings Program currently includes two separate 529 plans. The Advisor-Guided Plan is sold exclusively through financial advisory firms who have entered into Advisor-Guided Plan selling agreements with JPMorgan Distribution Services, Inc. You may also participate in the Direct Plan, which is sold directly by the Program and offers lower fees. However, the investment options available under the Advisor-Guided Plan are not available under the Direct Plan. The fees and expenses of the Advisor-Guided Plan include compensation to the financial advisory firm. Be sure to understand the options available before making an investment decision.

*For more information about New York's 529 Advisor-Guided College Savings Program, you may contact your financial advisor or obtain an Advisor-Guided Plan Disclosure Booklet and Tuition Savings Agreement at www.ny529advisor.com or by calling 1-800-774-2108. This document includes investment objectives, risks, charges, expenses, and other information. You should read and consider it carefully before investing.*

The Program Administrators, the Program Manager and JPMorgan Distribution Services, Inc., and their respective affiliates do not provide legal or tax advice. This information is provided for general educational purposes only. This is not to be considered legal or tax advice. Investors should consult with their legal or tax advisors for personalized assistance, including information regarding any specific state law requirements.

Ugift is a registered service mark of Ascensus Broker Dealer Service, Inc.

Copyright © 2019 JPMorgan Chase & Co., All rights reserved.

# Exhibit C-6



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
LOS ANGELES REGIONAL OFFICE
444 SOUTH FLOWER STREET
SUITE 900
LOS ANGELES, CALIFORNIA  90071-9591

May 29, 2019

<u>DELIVERY VIA SECURE EMAIL</u>

Ksenia Yudina
Chief Executive Officer and Chief Compliance Officer
U-Nest Holdings LLC
2920 West Olive Ave., Suite 105
Burbank, CA 91505
KSENIA@U-NEST.COM

Re:     Examination of U-Nest Holdings LLC ("Registrant")
        SEC File No. 801-112946

Dear Ms. Yudina:

The staff conducted an examination of Registrant, which evaluated compliance with certain provisions of the federal securities laws or other applicable rules and regulations (together, "federal securities laws").  The examination identified the deficiencies and weaknesses in controls (together, "findings") that are described in Exhibit A, and which the staff discussed during an exit interview on May 29, 2019 with Ksenia Yudina, Registrant's Chief Executive Officer and Chief Compliance Officer.

The staff is bringing these findings to your attention for immediate corrective action, without regard to any other action(s) that may result from the examination. The findings are based on the staff's examination and are not findings or conclusions of, or binding on, the Commission or any of its divisions or offices.  You should not conclude that any of the firm's activities not discussed in Exhibit A are in full compliance with the federal securities laws.  Nor should you conclude that Exhibit A sets forth an exhaustive list of the ways in which the firm's activities do not comply with the federal securities laws.  Neither the staff's findings or its communications during the course of the examination nor any remedial actions undertaken in response to such findings or communications foreclose the Commission from taking any action, including but not limited to an enforcement action, with respect to the firm.

The descriptions of the federal securities laws and related interpretations in Exhibit A may be paraphrased or abbreviated.  Please visit our website at http://www.sec.gov/divisions.shtml for complete information related to these regulatory requirements.

Please respond in writing to each of the matters described in Exhibit A by June 28, 2019, describing any steps you have taken or intend to take with respect to each deficiency identified.  Please include an electronic or hard copy signed cover letter with your response via secure electronic mail to the email address below or mail to the physical address below.

You should respond directly to this office as follows:

>  Tamara R. Heller
>  Assistant Regional Director
>  444 S. Flower Street, Suite 900
>  Los Angeles, California 90071
>  HellerT@sec.gov

Thank you for your cooperation.  If you have any questions, please contact Eric Lee at (323) 965-3320 or Andy Sohrn at (323) 965-2621.

Sincerely,

*Tamara Heller*

Digitally signed by TAMARA HELLER
Date: 2019.05.29 15:34:29 -07'00'

Tamara R. Heller
Assistant Regional Director

Attachment:  Exhibit A

Exhibit A
U-Nest Holdings LLC
(File No. 801-112946)

Deficiencies

The exam staff identified the following deficiencies during the examination:

**A. Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act") – Disclosures and Misleading Statements**

Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act") establishes a fiduciary duty for investment advisers to act in the best interests of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963).   Generally, a fact is material if there is a substantial likelihood that a reasonable investor in making an investment decision would consider it as having significantly altered the total mix of information available. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

**1. Failure to Adequately Disclose that Registrant's Investment Advice May Not Be Appropriate for Beneficiaries Who Need Pre-College 529 Distributions**

Registrant's clients open an account by downloading the Registrant's application to their phone, completing the advisory agreement, and establishing a monthly contribution plan.  As of the March 11, 2019 interview with the staff, Registrant disclosed that the only offerings available are the age-based investments within the Rhode Island CollegeBound 529 Program managed by Invesco Advisers, Inc.  In selecting the appropriate age-based investment for advisory clients, the **sole** determining factor considered by Registrant is the birthdate of the child; the birthdate of the child is used to calculate which year the child is expected to begin his or her college education, and Registrant selects the age-based investment option matching that year.

Under the Tax Cuts and Jobs Act of 2017 that went into effect January 1, 2018, distributions from 529 plans can now be used to pay up to $10,000 of tuition per beneficiary each year at an elementary or secondary (K-12) public, private or religious school of the beneficiary's choosing.[1] However, Registrant does not specifically disclose to its clients that its investment advice may not be appropriate for earlier K-12 educational expenses because Registrant's investment advice does not factor in the potential need to take pre-college distributions.  This information is material because Registrant's investment selection may not match the risk profile of a beneficiary who may need such earlier distributions.  If a beneficiary is expected (or may expect) to begin taking distributions beginning in elementary school, Registrant's investment selection may be too aggressive and risky for that particular beneficiary, or otherwise inappropriate. Indeed, the CollegeBound 529 Program Description (June 2018 Supplement) states that its age-based option "is designed to take into account a Beneficiary's age and the number of years

---

[1] *See, e.g.*, https://www.irs.gov/newsroom/irs-offers-guidance-on-recent-529-education-savings-plan-changes.

Exhibit A
U-Nest Holdings LLC
(File No. 801-112946)

before the Beneficiary is expected to attend higher education **and is not designed for saving for K-12 Tuition Expenses**…." (Emphasis added.)[2]

Registrant's failure to adequately disclose that its investment advice may not be appropriate for pre-college distributions because it does not factor in the potential distributions for eligible educational expenses prior to the college start-date, appears to be inconsistent with Section 206 of the Advisers Act.  Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

### 2.  Failure to Disclose Technological Compatibility as a Significant Factor in Due Diligence Process When Selecting 529 Plans

Registrant's Form ADV Part 2A, dated July 23, 2018, discloses that when evaluating a portfolio manager for selection on its investment platform, Registrant conducts an operational due diligence review, which entails, but is not limited to a review of the:

- 529 Plan account-opening processes, types of accounts available, flexibility in administering accounts, and the overall compatibility with technology;
- 529 Plan custodial arrangements, history and stability;
- Advisory firms that manage the assets within the 529 Plan;
- Disclosure documents (including fees, expenses, principal risks and other terms);
- State and advisory firms' level of communication and cooperation; and
- Other information that U-Nest deems relevant.

As noted above in Section A.1, during the March 11, 2019 interview with the staff, Registrant disclosed that the Rhode Island CollegeBound 529 Program managed by Invesco Advisers is the only investment vehicle currently available.  When asked why other managers were not included on Registrant's investment platform, Registrant disclosed that, among other reasons, the Rhode Island CollegeBound 529 Program was able to integrate onto Registrant's application, while other 529 plans, such as the Vanguard 529 plan, were unable to show that their platform could integrate with Registrant's application.

Thus, it appears that technological compatibility with Registrant's application is a significant element of the operational due diligence process, which was not disclosed to clients and potential clients.  This information is material to clients – especially for individuals living in states where there are income tax benefits from contributing to its own state-sponsored 529 plan – because clients would want to know whether technological compatibility (which has nothing to do with the performance history of that plan, the quality of that plan's investment manager, the fees charged by that plan, etc.) may have been a significant or determinative factor as to why Registrant's operational due diligence review did not approve certain 529 plans to be on Registrant's platform.

---

[2] *See* CollegeBound Saver Program Description, *available at* https://cdn.unite529.com/jcdn/files/RID/pdfs/programdescription.pdf (accessed May 15, 2019).

Exhibit A
U-Nest Holdings LLC
(File No. 801-112946)

Registrant's failure to disclose to clients, that technological compatibility with Registrant was a significant factor in its due diligence process when selecting 529 plans to offer to clients, is inconsistent with Section 206 of the Advisers Act. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

## B. Information Processing and Reporting - Misstatements and/or Omissions in Form ADV

Form ADV [17 C.F.R. Part 279.1] must be filed pursuant to Rule 203-1 as an application for registration of an investment adviser pursuant to Sections 203(c) or 203(g), and also as an amendment to registration pursuant to Rule 204-1. Section 207 of the Advisers Act makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203 or Section 204 of the Advisers Act, or to willfully omit to state in any such application or report any material fact which is required to be stated therein.

The examination revealed that Registrant failed to include sufficient information regarding professional designations in the Form ADV, Part 2B. For the Form ADV, Part 2B, the instructions to Item 2: Educational Background and Business Experience state "[y]ou may list any professional designations held by the *supervised person*, but if you do so, you must provide a sufficient explanation of the minimum qualifications required for each designation to allow *clients* to understand the value of the designation." Registrant's Form ADV, Part 2B dated July 23, 2018, lists the CFA charter as one of Ms. Yudina's credentials. However, there is no explanation of the minimum qualifications for the CFA charter in the Form ADV, Part 2B.

Inconsistent with 17 C.F.R. Part 279.1, Registrant filed a Form ADV, Part 2B that listed the CFA professional designation for Ms. Yudina, but failed to include a sufficient explanation of the minimum qualifications required for the CFA charter. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

## C. Rule 206(4)-1(a)(5) under the Advisers Act – Performance Advertising and Marketing – Misleading Statements

Advertisements are subject both to the general antifraud provisions in Section 206 and to specific prohibitions and restrictions under Rule 206(4)-1. Rule 206(4)-1(a)(5) (the "Advertising Rule") under the Advisers Act prohibits an investment adviser from publishing, circulating, or distributing, directly or indirectly, any advertisement that contains any untrue statement of a material fact, or that is otherwise false or misleading.

Exhibit A
U-Nest Holdings LLC
(File No. 801-112946)

Registrant discloses in the footnotes of its website, https://u-nest.com, the following information "[t]his website is operated by U-Nest Holdings LLC, an SEC Registered Investment Advisor and a member of FINRA."

Under FINRA Rule 0160(b)(10),[3] "[t]he term 'member' means any individual, partnership, corporation or other legal entity admitted to membership in FINRA under the provisions of Articles III and IV of the FINRA By-Laws."  Article III of the FINRA By-Laws (section 1, paragraph (a))[4] states that "[a]ny registered broker, dealer, municipal securities broker or dealer, or government securities broker or dealer authorized to transact, and whose regular course of business consists in actually transacting, any branch of the investment banking or securities business in the United States, under the laws of the United States, shall be eligible for membership in the Corporation…."

Registrant does not meet the FINRA definition of an eligible "member;" Registrant is not a broker or dealer as specified in Article III of the FINRA By-Laws.  As such, Registrant's statement on its website that it is a "member of FINRA" is false.

Registrant violated the Advertising Rule because it is false to claim that Registrant is a "member of FINRA."  Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

### D. Rule 206(4)-1(a)(1) - Performance Advertising and Marketing - Failure to Comply with the Testimonial Rule

Advertisements are subject both to the general antifraud provisions in Section 206 and to specific prohibitions and restrictions under Rule 206(4)-1.  Rule 206(4)-l(a)(l) (the "Testimonial Rule") states that it shall constitute a fraudulent act for an investment adviser to distribute an advertisement which refers, directly or indirectly, to any testimonial of any kind concerning the investment adviser or concerning any advice, analysis, report or other service rendered by such investment adviser.

As of May 8, 2019, Registrant's website included three testimonials next to what appears to be 5-star reviews:

- So convenient! I was able to sign up with kids in the room, which is a super important aspect! – Jeff
- Very easy and quick! Love being able to see the amount my child will have by the time she is in college! – Tanya
- Very practical application that shows you a long-term planning. I now have peace of mind when it comes to saving for my kids' college! – Mark

---

[3] http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=5456

[4] http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4604

Exhibit A
U-Nest Holdings LLC
(File No. 801-112946)

The three testimonials refer directly to the services rendered by Registrant.  Registrant violated the Testimonial Rule because it referred to testimonials of advisory clients in its advertisements/website.  Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

### E.  Rule 206(4)-7(a) under the Advisers Act - Compliance and Internal Controls

Rule 206(4)-7(a) (the "Compliance Rule") under the Advisers Act requires registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act by the adviser or any of its supervised persons.  Each adviser should identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks.  The Commission expects that an adviser's policies and procedures, at a minimum, address a standard set of operations to the extent that they are relevant to the adviser including, but not limited to: "[t]he accuracy of disclosures made to investors, clients, and regulators"; "[s]afeguarding of client assets from conversion or inappropriate use by advisory personnel"; and "[m]arketing advisory services."[5]

Registrant does not appear to have adopted and implemented written policies and procedures reasonably designed to prevent violations of the Advisers Act by the adviser or its supervised persons.  It does not appear that Registrant has designed policies and procedures that address certain risks for the firm and its clients in light of the firm's particular operations.

The staff noted that the Compliance Manual omitted policies and procedures specifically related to a number of areas including, but not limited to:

- The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;
- The accurate creation of required records and their maintenance in a manner that secures them from unauthorized alteration or use and protects them from untimely destruction; and
- Marketing advisory services, including the use of solicitors.

Registrant violated the Compliance Rule because its policies and procedures do not address key components of Registrant's business model.  Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.

---

[5] *See* Compliance Programs of Investment Companies and Investment Advisers, Advisers Act Release No. 2204 (Dec. 17, 2003), *available at* http://www.sec.gov/rules/final/ia-2204.htm.

# Exhibit C-7

June 27, 2019

**BY ELECTRONIC MAIL**

Tamara R. Heller
Assistant Regional Director
United States Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, California 90071-9591
HellerT@sec.gov

Re:     Examination of U-Nest Holdings LLC
        SEC File No. 801-112946

Dear Ms. Heller:

This letter responds to your letter to me dated May 29, 2019 (the "**Letter**") that sets forth various matters at <u>Exhibit A</u> to the Letter with regard to the examination of U-Nest Holdings LLC (the "**Registrant**" or "**U-Nest**") by the staff (the "**Staff**") of the Securities and Exchange Commission (the "**Commission**"). U-Nest appreciates the opportunity to respond to these matters, as well as the opportunity to improve and enhance its compliance program in response to the Staff's comments.

U-Nest acknowledges receipt of the Staff's comments, excerpts of which are included below in italics and followed by U-Nest's responses. For each matter identified, U-Nest provides an explanation of the facts and circumstances related to the Staff's comments (where appropriate) and sets forth the changes U-Nest will implement to its compliance program and other measures U-Nest will undertake in response to the Staff's comments. U-Nest does so, however, without admitting that the facts and circumstances described in the Staff's comments are correct or support the Staff's expressed concerns, observations, possible violations or control deficiencies and weaknesses.

### A.   *Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act") – Disclosures and Misleading Statements*

*Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act") establishes a fiduciary duty for investment advisers to act in the best interests of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients. See, e.g., SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-92 (1963). Generally, a fact is material if there is a substantial likelihood that a reasonable investor in making an investment decision would consider it as having significantly altered the total mix of information available. See Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).*

#### 1.   *Failure to Adequately Disclose that Registrant's Investment Advice May Not Be Appropriate for Beneficiaries Who Need Pre-College 529 Distributions*

*Registrant's clients open an account by downloading the Registrant's application to their phone, completing the advisory agreement, and establishing a monthly contribution plan. As of the March 11, 2019 interview with the staff, Registrant disclosed that the only offerings available are the age-based*

United States Securities and Exchange Commission
June 27, 2019
Page 2

*investments within the Rhode Island CollegeBound 529 Program managed by Invesco Advisers, Inc. In selecting the appropriate age-based investment for advisory clients, the sole determining factor considered by Registrant is the birthdate of the child; the birthdate of the child is used to calculate which year the child is expected to begin his or her college education, and Registrant selects the age-based investment option matching that year…*

*…Registrant's failure to adequately disclose that its investment advice may not be appropriate for pre-college distributions because it does not factor in the potential distributions for eligible educational expenses prior to the college start-date, appears to be inconsistent with Section 206 of the Advisers Act. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: U-Nest has added the following disclosure to Form ADV Part 2A:

> Under the Tax Cuts and Jobs Act of 2017 that went into effect January 1, 2018, distributions from 529 plans can now be used to pay up to $10,000 of tuition per beneficiary each year at an elementary or secondary ("K-12") public, private or religious school of the beneficiary's choosing. However, U-Nest is focused on college distributions, and may not be appropriate if a beneficiary is expected (or may expect) to begin taking distributions for K-12 expenses. The 529 Plan investment choices are designed to take into account a beneficiary's age and the number of years before the beneficiary is expected to attend higher education and is NOT designed for saving for K-12 expenses.

Please see the Item 6 of the enclosed Form ADV Part 2A.

## 2. *Failure to Disclose Technological Compatibility as a Significant Factor in Due Diligence Process When Selecting 529 Plans*

*Registrant's Form ADV Part 2A, dated July 23, 2018, discloses that when evaluating a portfolio manager for selection on its investment platform, Registrant conducts an operational due diligence review, which entails, but is not limited to a review of the:*

- *529 Plan account-opening processes, types of accounts available, flexibility in administering accounts, and the overall compatibility with technology;*
- *529 Plan custodial arrangements, history and stability;*
- *Advisory firms that manage the assets within the 529 Plan;*
- *Disclosure documents (including fees, expenses, principal risks and other terms);*
- *State and advisory firms' level of communication and cooperation; and*
- *Other information that U-Nest deems relevant.*

*As noted above in Section A.1, during the March 11, 2019 interview with the staff, Registrant disclosed that the Rhode Island CollegeBound 529 Program managed by Invesco Advisers is the only investment vehicle currently available. When asked why other managers were not included on Registrant's investment platform, Registrant disclosed that, among other reasons, the Rhode Island CollegeBound 529 Program was able to integrate onto Registrant's application, while other 529 plans, such as the Vanguard 529 plan,*

United States Securities and Exchange Commission
June 27, 2019
Page 3

*were unable to show that their platform could integrate with Registrant's application.*

*Thus, it appears that technological compatibility with Registrant's application is a significant element of the operational due diligence process, which was not disclosed to clients and potential clients. This information is material to clients – especially for individuals living in states where there are income tax benefits from contributing to its own state-sponsored 529 plan – because clients would want to know whether technological compatibility (which has nothing to do with the performance history of that plan, the quality of that plan's investment manager, the fees charged by that plan, etc.) may have been a significant or determinative factor as to why Registrant's operational due diligence review did not approve certain 529 plans to be on Registrant's platform.*

*Registrant's failure to disclose to clients, that technological compatibility with Registrant was a significant factor in its due diligence process when selecting 529 plans to offer to clients, is inconsistent with Section 206 of the Advisers Act. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: U-Nest does not believe that it acted inconsistent with Section 206 of the Advisers Act in that the Form ADV Part 2A did disclose the "overall compatibility with technology" was a factor in U-Nest's review of managers. However, U-Nest has updated its disclosure to emphasize the significance of the technological compatibility factor in its due diligence process. Please see the Item 6 of the enclosed Form ADV Part 2A.

### 3. Information Processing and Reporting - Misstatements and/or Omissions in Form ADV

*…Inconsistent with 17 C.F.R. Part 279.1, Registrant filed a Form ADV, Part 2B that listed the CFA professional designation for Ms. Yudina, but failed to include a sufficient explanation of the minimum qualifications required for the CFA charter. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: U-Nest has added the following disclosure to Form ADV, Part 2B:

> Chartered Financial Analyst (CFA) charter is a professional designation established in 1962 and awarded by CFA Institute. To earn the CFA charter, candidates must pass three sequential, six-hour examinations over two to four years. The three levels of the CFA Program test a wide range of investment topics, including ethical and professional standards, fixed-income analysis, alternative and derivative investments, and portfolio management and wealth planning. In addition, CFA charterholders must have at least four years of acceptable professional experience in the investment decision-making process and must commit to abide by, and annually reaffirm, their adherence to the CFA Institute Code of Ethics and Standards of Professional Conduct.

Please see the enclosed Form ADV Part 2B.

United States Securities and Exchange Commission
June 27, 2019
Page 4

### 4. Rule 206(4)-1(a)(5) under the Advisers Act – Performance Advertising and Marketing – Misleading Statements

*Advertisements are subject both to the general antifraud provisions in Section 206 and to specific prohibitions and restrictions under Rule 206(4)-1. Rule 206(4)-1(a)(5) (the "Advertising Rule") under the Advisers Act prohibits an investment adviser from publishing, circulating, or distributing, directly or indirectly, any advertisement that contains any untrue statement of a material fact, or that is otherwise false or misleading.*

*Registrant discloses in the footnotes of its website, https://u-nest.com, the following information "[t]his website is operated by U-Nest Holdings LLC, an SEC Registered Investment Advisor and a member of FINRA."*

*Under FINRA Rule 0160(b)(10),[1] "[t]he term 'member' means any individual, partnership, corporation or other legal entity admitted to membership in FINRA under the provisions of Articles III and IV of the FINRA By-Laws." Article III of the FINRA By-Laws (section 1, paragraph (a)[2] states that "[a]ny registered broker, dealer, municipal securities broker or dealer, or government securities broker or dealer authorized to transact, and whose regular course of business consists in actually transacting, any branch of the investment banking or securities business in the United States, under the laws of the United States, shall be eligible for membership in the Corporation…."*

*Registrant does not meet the FINRA definition of an eligible "member;" Registrant is not a broker or dealer as specified in Article III of the FINRA By-Laws. As such, Registrant's statement on its website that it is a "member of FINRA" is false.*

*Registrant violated the Advertising Rule because it is false to claim that Registrant is a "member of FINRA." Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: The website footnote was revised on 6/22/2019 to state:

> This website is operated by U-Nest Holdings LLC, an SEC Registered Investment Adviser. Registration as an investment adviser with the SEC does not imply a certain level of skill or training. In addition, the information on this website has not been approved or verified by the SEC or by any state securities authority….

Please see the enclosed screenshot of the website page.

### 5. Rule 206(4)-1(a)(1) - Performance Advertising and Marketing - Failure to Comply with the Testimonial Rule

*Advertisements are subject both to the general antifraud provisions in Section 206 and to specific prohibitions and restrictions under Rule 206(4)-1. Rule 206(4)-1(a)(1) (the "Testimonial Rule") states that*

---

[1] *http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=5456*
[2] *http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4604*

United States Securities and Exchange Commission
June 27, 2019
Page 5

*it shall constitute a fraudulent act for an investment adviser to distribute an advertisement which refers, directly or indirectly, to any testimonial of any kind concerning the investment adviser or concerning any advice, analysis, report or other service rendered by such investment adviser.*

*As of May 8, 2019, Registrant's website included three testimonials next to what appears to be 5-star reviews:*

- *So convenient! I was able to sign up with kids in the room, which is a super important aspect! – Jeff*
- *Very easy and quick! Love being able to see the amount my child will have by the time she is in college! – Tanya*
- *Very practical application that shows you a long-term planning. I now have peace of mind when it comes to saving for my kids' college! – Mark*

*The three testimonials refer directly to the services rendered by Registrant. Registrant violated the Testimonial Rule because it referred to testimonials of advisory clients in its advertisements/website. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: U-Nest has removed the client comments from its website as of 6.22.2019. Please see the enclosed screenshot of the website homepage.

### 6.   Rule 206(4)-7(a) under the Advisers Act - Compliance and Internal Controls

*Rule 206(4)-7(a) (the "Compliance Rule") under the Advisers Act requires registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act by the adviser or any of its supervised persons. Each adviser should identify conflicts and other compliance factors creating risk exposure for the firm and its clients in light of the firm's particular operations, and then design policies and procedures that address those risks. The Commission expects that an adviser's policies and procedures, at a minimum, address a standard set of operations to the extent that they are relevant to the adviser including, but not limited to: "[t]he accuracy of disclosures made to investors, clients, and regulators"; "[s]afeguarding of client assets from conversion or inappropriate use by advisory personnel"; and "[m]arketing advisory services."[5]*

*Registrant does not appear to have adopted and implemented written policies and procedures reasonably designed to prevent violations of the Advisers Act by the adviser or its supervised persons. It does not appear that Registrant has designed policies and procedures that address certain risks for the firm and its clients in light of the firm's particular operations.*

*The staff noted that the Compliance Manual omitted policies and procedures specifically related to a number of areas including, but not limited to:*

- *The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements;*
- *The accurate creation of required records and their maintenance in a manner that secures them*

United States Securities and Exchange Commission
June 27, 2019
Page 6

> *from unauthorized alteration or use and protects them from untimely destruction; and*
- *Marketing advisory services, including the use of solicitors.*

*Registrant violated the Compliance Rule because its policies and procedures do not address key components of Registrant's business model. Registrant should take corrective action(s) that it considers appropriate to address this deficiency; inform the staff of the corrective action(s) it is taking in response to the deficiency; and provide documentation of such corrective action(s) to the staff.*

**U-Nest's Response**: U-Nest is undertaking to review its Policies and Procedures to address the Staff's specific concerns noted above as well as to address other key components of U-Nest's business model. U-Nest will engage a third-party compliance consultant to assist in this process and to help ensure that U-Nest's compliance program is reasonably designed to prevent violations of the Advisers Act. Upon completion, U-Nest will provide the Staff with the updated Policies and Procedures.

If you have any questions regarding any of the responses herein or would like any additional information, please do not hesitate to contact me directly at (301) 923-0363 or by e-mail at ksenia.yudina@u-nest.com.

Sincerely,

Ksenia Yudina, CFA
Founder and CEO
U-Nest Holdings LLC

Enclosures:
U-Nest's Form ADV Part 2A, June 27, 2019
U-Nest's Form ADV Part 2B, June 27, 2019
Website homepage as of June 22, 2019

# Exhibit C-8

1,533 views  |  Nov 12, 2019, 12:13pm

# U-Nest Helps Impatient, And Tech-Astute, Parents Open 529 College Savings Plans

 **Tom Groenfeldt** Contributor ⓘ
Enterprise Tech
*I write about finance and technology.*

Bankrate says that American families are missing an estimated benefit of $237 billion for future educational savings because they're not using 529 college savings plans effectively, citing a report from Morningstar.

Ksenia Yudina, founder and CEO of U-Nest, has set out to do something about that. Formerly a vice president at Capital Group/American Funds, the largest 529 provider in the U.S., she has launched a way for families to use the 529 plan to save for their children's education with a mobile phone. She discussed her company at Money2020 which she attended with Peter Mansfield, U-Nest's chief marketing officer.

We've updated our Privacy Statement. Click here to learn more.                                                    ×

Case 1:19-cv-00659-WES-PAS   Document 6-4   Filed 12/20/19   Page 49 of 51   PageID #: 216



Ksenia Yudina, founder and CEO of U-Nest  COURTESY U-NEST

Q What does your company do?

A We have developed the first mobile app that helps parents set up and manage 529 college savings plans. What used to take eight hours of time to research we put into five minutes.

Q Why?

A I came up with this idea basically based on both my personal and professional experience. I graduated from an MBA program (UCLA's Anderson School of Management) $180,000 in debt, and that's not the most expensive MBA program.

We've updated our Privacy Statement. Click here to learn more.                                              ✕

Case 1:19-cv-00659-WES-PAS Document 67-4 Filed 12/20/19 Page 50 of 51 PageID #: 217

Q But you were already working at a leading 529 provider, so why leave to start your own company?

A I worked with high net worth families, over $5 million, and they were using 529. It's a top priority for them and everyone likes saving on taxes, but they aren't the ones who need it most. A lot of my friends started forming families and approached me with the same question — how can we be set up a college fund?

Q So why not sign them up at Capital Group?

A We dealt with a lot of people who work with or as a financial advisors. The advisors would create a 16-page doc and send it to clients by FedEx for a signature. When I suggested something like that to my friends, they pushed back and said they used Robinhood and mobile banking, what's wrong with 529 plans that they are still on paper? They wanted to take advantage of it, but it's so confusing and complex and they didn't have time to do all the research.

Q How did you get it off the ground?

A I funded the beginning myself with over $160,000, and an angel investor who knew me put in $300,000. We just closed a seed round with several funds.

Q What's the response?

A Our goal was a pilot program with 1,000 families, and we reached that number pretty quickly…our rating in the iOS App Store is 4.8 or 4.9, and we are about to launch Android.

Q Who is signing up?

A The first clients were my personal friends and also some of my investors, because they were eager to test it, and they had small kids. The feedback was that it is super simple and super fast.

Q How are they finding out about you?

A Good question. About 70% of people don't know about the 529 program, which is what happens when you leave marketing to the states. Financial advisors haven't been too enthusiastic because it take a lot of work and client education for not much in the way of commissions.

Q So, are you changing any of this?

A By becoming this sort of digital advisor, we have been able to remove all those hurdles and eliminate a lot of paperwork.

Q Does that make your approach attractive for financial advisor firms?

A Yes, a few large advisor networks are looking at it, because it provides a way to get into younger households. Advisor networks have had a tough time reaching young families, and some see this as a gateway product to allow advisors to sell other life-stage products.

Q Do your clients invest the maximum of $15,000 per year?

We've updated our Privacy Statement. Click here to learn more.                                                    ×

A. The average is $200 a month, but mostly we want people to be consistent, even if it's as little as $25. They can set it up to be an automatic payment and then adjust the asset allocation based on the age of the student, becoming more conservative as the time for college gets closer.

Q Are you using it?

A Yes. I have three kids, so I tried out several plans as part of our R&D. My oldest is nine and I have twins, one boy and one girl, who are 4 years old. I believe in education; I have a CFA and an MBA. Education helps you be successful in life and I don't want them to be burdened by student loans.

Q. What else?

A We have a gift option so friends and relatives, like grandparents, can donate to a child's account.

Q What's it like being a woman and raising funds in Silicon Valley?

A We could write a book. It's not so much overt sexism but insidious reactions where people are overly nice. But they have also asked Peter about my "coachability", which he says no one ever asked him about a male CEO. In one funding meeting, when Peter stepped out the VC turned and asked how the company had discovered me. I'm the CEO, I said. He was shocked.

Q Was this a surprise?

A I didn't know how hard it was going to be, but I have found out that only 2% of women get money from venture funds. I spend a lot of time in meetings, and frequently the business relationship questions go to Peter and the personal questions go to me.

Q Has attending Money2020 helped?

A We are at a fintech conference and instead of having women in events, they have separate events for women. I favor inclusion. One reason women have less access to capital is because we are not as networked as the guys. We need to be qualified based on our credentials and what have we have achieved in life, and not on gender.

*Follow me on* Twitter. *Check out my* website.

 **Tom Groenfeldt**

I like the pace of technology, especially in finance where it can move so fast. I'm on Jay Palter's list of fintech influencers to follow in 2018, although it takes a bi… **Read More**

We've updated our Privacy Statement. Click here to learn more.                                                    ✕