UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U-NEST HOLDINGS, INC. | : |
| | : |
| Plaintiff | : |
| | : |
| v. | :     C.A. No. 1:19-cv-00659-WES-PAS |
| | : |
| ASCENSUS COLLEGE SAVINGS | : |
| RECORDKEEPING SERVICES, LLC | : |
| | : |
| Defendant | : |

## FIRST AMENDED COMPLAINT

Plaintiff, U-Nest Holdings, Inc. ("U-Nest"), by and through its undersigned attorneys, hereby brings this First Amended Complaint against defendant Ascensus College Savings Recordkeeping Services, LLC ("Ascensus") for violations of federal antitrust laws, including Section 2 of the Sherman Act, Section 4 of the Clayton Act, and for the related breach of a settlement agreement entered into between Invesco Distributors, Inc. ("Invesco"), Ascensus, and U-Nest (Ascensus and U-Nest collectively, the "Parties") on November 27, 2019 (the "*Settlement Agreement*"). A copy of the *Settlement Agreement* is attached hereto as **Exhibit A**.

### Parties

1.  Plaintiff U-Nest is a corporation incorporated under the laws of the state of Delaware with its principal place of business located at 2920 West Olive Avenue, Burbank, California 91505.

2.  Defendant Ascensus is a limited liability corporation with its principal place of business located at 95 Wells Avenue, Suite 160, Newton, Massachusetts 02459.

## Jurisdiction and Venue

3. This Court has subject matter jurisdiction in this controversy pursuant to 28 U.S.C. §1331 and 1337(a) because it includes a request for adjudication of claim(s) that present a federal question, including under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Ascensus for injuries sustained and to be sustained by U-Nest for violations, as alleged herein, of Section 2 of the Sherman Act, 15 U.S.C. §§ 2.[1]

3A. Ascensus is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Ascensus manages the RI Program which impacts investors located within and without Rhode Island.

3B. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact. The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

---

[1] U-Nest put Ascensus on notice in its Emergency Motion for Preliminary Injunction, at page 23, footnote 11, that it had antitrust claims it reserved the right to assert. U-Nest continues to reserve its rights to further amend this complaint or to file a different complaint in a different forum that more fully sets out its federal antitrust claims. Confronted with extreme constraints on time, U-Nest has only pleaded one such Count here, although it believes that Count has enough facts to make out multiple individual claims for violations of Sherman Act § 2.

3C.     This Court has personal jurisdiction over Ascensus because it has at all times relevant
        hereto systematically and continuously transacted substantial business in Rhode Island.

4.      Furthermore, the *Settlement Agreement* provides that the courts of the State of Rhode
        Island and the United States District Court for the District of Rhode Island have
        exclusive jurisdiction over any and all disputes arising out of the *Settlement Agreement*.

5.      In addition, at a chambers conference with the Honorable Justice Long of the Rhode
        Island Superior Court on December 18, 2019, counsel for Ascensus represented that
        the instant dispute belongs in federal court.

6.      Venue in this district is based on 28 U.S.C. § 1391 because, among other reasons,
        Ascensus transacts business in this District, and a substantial (if not dominant) part of
        the events or omissions giving rise to the claims occurred in this District.

## Facts

### *Parties*

7.      U-Nest is a mobile application for iPhone that allows end-user account holders to save
        for their children's education *via* a tax-advantaged 529 college savings plan.  U-Nest
        also markets such plans to prospective end-user account holders.

8.      The CollegeBound 529 ("RI Program") is a qualified tuition program governed by
        Section 529 of the Internal Revenue Code of 1986, as amended, sponsored by the State
        of Rhode Island and Providence Plantations and administered by the Rhode Island
        Office of the General Treasurer.

9.      Ascensus is the program manager for the RI Program pursuant to an agreement between
        the Treasurer and Ascensus dated March 18, 2016.

- 3 -

81830458v.3

10.     Invesco is the distributor of the RI Program pursuant to an agreement between
        Ascensus and Invesco.

### *Agreement for Recommending 529 Plan Securities*

11.     On or about May 7, 2018, U-Nest[2] and Invesco entered into an *Agreement for
        Recommending 529 Plan Securities (*"*RI Selling Agreement*").  A copy of the *RI Selling
        Agreement* is attached hereto as **Exhibit B** and incorporated herein by reference.

12.     In October 2018, U-Nest launched its mobile application and began marketing 529
        plans to potential end-user account holders.

13.     Under the *RI Selling Agreement*, U-Nest was authorized to recommend, on a non-
        exclusive basis, Invesco-managed municipal fund securities that are in the RI Program
        ("RI Program Interests").

14.     U-Nest end-user account holders sign an *Advisory Agreement Terms and Conditions*
        ("*Advisory Agreement*") when they contract to use U-Nest's services.

15.     Under the terms of the *Advisory Agreement*, end-user account holders provide U-Nest
        with a limited power of attorney and appoint U-Nest as their attorney-in-fact and agent
        to interface with 529 plans.

16.     The *RI Selling Agreement* expressly acknowledges that U-Nest contracts directly with
        end-user account holders to provide services.  *RI Selling Agreement* § 1(e)(ii).

17.     The *CollegeBound 529 Non-Rhode Island Resident Enrollment Form* ("*Program
        Enrollment Form*") allows the end-user to designate the Financial Advisor of their
        choosing, providing that designated Financial Advisor with authority to access their

---

[2]U-Nest was converted from a limited liability company to a Delaware corporation in July 2019.

- 4 -

account and the ability to perform transactions on their behalf.  A copy of the *Program Enrollment Form* is attached hereto as **Exhibit C** and incorporated herein by reference.

18.     The selection of U-Nest as the end-user's Financial Advisor on the *Program Enrollment Form* allows U-Nest to access a RI Program client / advisor portal on the end-user account holder's behalf and to make transactions.

19.     Page 6 of the *Program Enrollment Form* lists a number of Invesco portfolios as investment options.  In addition, page 10 makes a number of disclosures regarding Ascensus and Invesco.  Lastly, page 11 contains Ascensus and Invesco logos.

*Marketing*

20.     Under the *RI Selling Agreement* (§ 1(a)), U-Nest is permitted to recommend the RI Program Interests to prospective end-user account holders.

***Termination of the RI Selling Agreement***

21.      The *RI Selling Agreement* allowed either party to terminate, without penalty, on thirty (30) days' prior written notice to the other party.  *Agreement* § 6(b).

22.     The *RI Selling Agreement* also allowed either party to terminate the *Agreement* immediately, without notice, if the other party breached.

23.     In a letter dated October 31, 2019, Invesco provided written notice that it was terminating the *RI Selling Agreement* effective November 30, 2019 ("*Termination Letter*").

24.     While the *Termination Letter* alleged that U-Nest was in breach of the *RI Selling Agreement,* Invesco did not terminate the *RI Selling Agreement* immediately and without notice as permitted by Section 6(c) of the *RI Selling Agreement* in the event of a breach.

- 5 -

25.     As a result of the *Termination Letter*, U-Nest promptly contacted Invesco to ensure that U-Nest would be able to maintain uninterrupted access to the client / advisor portal on behalf of end-user account holders with whom they contracted to serve as their Financial Advisor prior to the termination date (November 30).   Specifically, on November 1, 2019, a representative from U-Nest spoke with a representative from Invesco.   Based on that conversation, U-Nest was initially under the impression that there would not be any interruption to existing end-user account holders.

26.     During a telephone call on or about November 20, 2019, representatives of Invesco and Ascensus informed U-Nest that its access to the client /advisor portal would be terminated and/or otherwise limited when the *RI Selling Agreement* was terminated effective November 30, 2019.

27.     During that phone call, U-Nest was advised that there was no flexibility on the termination date and that the affected approximately 500 end-user account holders (the savers for college tuition who invested in the plan through efforts of U-Nest) would become Invesco-labeled accounts.

28.     On or about November 21, 2019, U-Nest's counsel spoke with Invesco representatives who told counsel that any issues needed to be discussed with Ascensus because Ascensus, not Invesco, controls access to the client / advisor portal.

29.     As of November 25, 2019, five days before the termination date, and heading into the Thanksgiving holiday, Ascensus refused to engage with U-Nest on how to ensure that U-Nest had continuing access to the client / advisor portal post-termination, and directed U-Nest to engage with Invesco, which in turn refused to engage further with U-Nest.

- 6 -

30.     U-Nest needed uninterrupted access and rights to continue servicing their 500 plus end-user account holders who were already in the RI Program through the client / advisor portal for which those end-user account holders specifically contracted as described above.

*Rhode Island Superior Court Action and Settlement*

31.     Because those approximately 500 end-user account holders (comprised of families) would have been negatively impacted if Ascensus were permitted to terminate U-Nest's access to its accounts on November 30, 2019, U-Nest filed an action in Rhode Island Superior Court on November 25, 2019 ("Original Action").  *See Verified Complaint*, attached hereto as **Exhibit D** (the "Original Complaint").  U-Nest also filed a *Motion for Temporary Restraining Order* ("*TRO Motion*").  *See TRO Motion*, attached hereto as **Exhibit E**.

32.     Ascensus failed to appear at the initial hearing on the *TRO Motion* despite timely notice thereof.

33.     At the hearing on the *TRO Motion* on the following day, November 26, 2019, U-Nest, Invesco and Ascensus discussed settlement and on November 27, 2019, reached the *Settlement Agreement* in order to settle all the claims against Invesco and Ascensus in the Original Action.

34.     The *Settlement Agreement* was fully executed on November 27, 2019.  *See* **Exhibit A** hereto.  The *Settlement Agreement* provided in pertinent part as follows:

    •       U-Nest would maintain access to account information for its existing
            clients who are already invested in the RI Program through December 31,
            2019;

- 7 -

- •   No correspondence would be sent by Invesco, Ascensus, or the State of Rhode Island Department of Treasury to U-Nest's existing clients who are already invested in the RI Program through December 31, 2019;

- •   Should any of U-Nest's existing clients who are already invested in the RI Program not roll over into a different state's program prior to January 1, 2020, then correspondence would be sent only to those account holders remaining in the RI Program by Invesco, Ascensus, or the State of Rhode Island;

- •   U-Nest would revise some of its current disclosures concerning Invesco's role as "custodian", which characterization Invesco claims is not accurate, and potentially other minor revisions that Invesco would request; and

- •   U-Nest would dismiss the lawsuit in its entirety and with prejudice.

See *Settlement Agreement*, **Exhibit A**.

35.   The *Settlement Agreement* also contained a cooperation clause:

> **Other Assurances and Duty to Cooperate.** Each Party hereto shall provide such further and other written assurance necessary to effectuate the terms and intent hereof and *cooperate with each other to the extent necessary to effectuate the provisions of this Agreement after it becomes effective. The Parties will continue to fulfill any existing obligations of good faith and fair dealing in their interactions and cooperate regarding the RI Program through December 31, 2019*. If U-Nest or a U-Nest end-user requests information regarding the end-user's account after December 31, 2019, Ascensus will follow its usual business practices in responding.

*Settlement Agreement* ¶ 13 (emphasis added).

36.   Immediately following the finalization of the *Settlement Agreement*, U-Nest began working to fulfill its obligations under the *Settlement Agreement*.[3]  Specifically, the following events occurred:

---

[3]   U-Nest also promptly removed references to Invesco in its marketing materials.  This was completed by December 5, 2019, and a correspondence was sent to Invesco to that effect on that date.

- 8 -

a) U-Nest began completing the necessary forms in connection with the rollover process on Monday, December 2 (immediately following Thanksgiving) in order to meet the December 31 deadline to exit its accounts from the RI Program;

b) U-Nest contacted the service center at Ascensus regarding the rollover process to try to make it as smooth as possible;

c) U-Nest's counsel approached Ascensus' counsel on Monday, December 2, seeking a phone call with an Ascensus point person also in order to make the rollover process as smooth as possible;

d) Ascensus' counsel declined, and instead referred U-Nest to generic website instructions;

e) Upon further follow up from U-Nest's counsel, Ascensus' counsel finally agreed to arrange a call between U-Nest and Ascensus to discuss the rollover process, and pledged that the call would involve a "senior person" at Ascensus;

f) The call was scheduled for 12:00 Noon ET on Friday, December 6, with at least four individuals at Ascensus and multiple individuals at U-Nest (including counsel for both parties);

g) Then, at 11:49 AM EST on December 6, 2019, just 11 minutes before the scheduled call was to take place, Ascensus' counsel emailed and stated in relevant part:

> We will not be moving forward w/ the call scheduled for noon today.
> I expect that U-Nest will receive a communication later this

> afternoon or tomorrow, and you can call me after that if you have
> any questions.[4]

### *Ascensus' Interference with U-Nest's Participation in NY Program*

37.   Just hours after Ascensus unilaterally canceled the December 6, 2019, phone call between Ascensus and U-Nest, U-Nest received a phone call from JPMorgan Chase that it would no longer be allowed to rollover Rhode Island accounts into the corollary 529 savings plan in New York (the "NY Program") and that all of its current accounts were being "frozen."

38.   Ascensus is also the program manager for the NY Program.   JPMorgan Asset Management ("JPM") is the program distributor, akin to the role of Invesco in Rhode Island.

39.   U-Nest later received final notice from JPM that such termination will be effective January 6, 2020.

40.   Ascensus wrongfully and maliciously caused JPM to terminate U-Nest's NY Program selling agreement behind U-Nest's back when Ascensus was supposed to be cooperating with U-Nest.

41.   JPM informed U-Nest that Ascensus encouraged the termination because U-Net's accounts are "high risk," (which is untrue) and JPM led U-Nest to believe that Ascensus had accused U-Nest of being "high risk" to JPM.

---

[4] Undersigned counsel does not invoke correspondence with opposing counsel lightly, nor does he in so doing suggest in any way that counsel acted inappropriately.   Instead, such correspondence is referenced solely for the evidence of the messages counsel was conveying on Ascensus' behalf.

- 10 -

42. Ascensus knew or should have known that U-Nest was rolling its RI Program accounts into the NY Program because Ascensus is the manager for both states.

43. Nothing in the *Settlement Agreement* prevented the rollovers to the NY Program.

44. Ascensus ***must have known*** at the time it signed the *Settlement Agreement* that U-Nest had a selling agreement in New York.

45. Ascensus never bothered to call U-Nest despite the "cooperation" provision in the *Settlement Agreement*, to even alert U-Nest or discuss whatever the issue was in any way.

46. Instead, Ascensus' malicious and nefarious act was to (1) cancel the scheduled call with U-Nest (specifically to discuss rollover) and (2) cause the NY Program selling agreement to be terminated by defaming U-Nest to JPM.

47. Ascensus' conduct has resulted in the inability of U-Nest to market and open new accounts in two states, prevents U-Nest from offering its new Android application and threatens its standing with its investors, and the amount of such damage exceeds $75,000.00.

## COUNT I
## (Injunctive Relief against Ascensus)

48. U-Nest incorporates paragraphs 1-47 as if fully set forth herein.

49. U-Nest will be permanently and irreparably harmed if Ascensus is not required to comply with the *Settlement Agreement.*

50. U-Nest has no adequate remedy at law because Ascensus' actions are depriving it of the benefit of the *Settlement Agreement* and preventing it from complying with the *Settlement Agreement*.

- 11 -

51.    The reputational harm to U-Nest if Ascensus is not required to comply with the terms
       of the *Settlement Agreement* will be particularly damaging because many of U-Nest's
       end-user account holders will lose confidence in U-Nest, resulting in loss of business
       and serious reputational harm to U-Nest.

52.    Further, U-Nest's 500-plus end-users in the RI Program will lose access to their RI
       Program accounts through the U-Nest application as of January 1, 2020, causing
       confusion and subjecting U-Nest (and Ascensus) to further litigation.

53.    U-Nest has a substantial likelihood of success on the merits of this claim.

54.    Based on the irreparable harm that U-Nest has suffered, and will continue to suffer, U-
       Nest has no adequate remedy at law with regard to Ascensus' ongoing conduct and is
       entitled to injunctive relief.

55.    As a result of Ascensus' failure to comply with the terms of the *Settlement Agreement*,
       U-Nest will suffer actual damages as well as irreparable harm to its business, reputation
       and client relationships.

## COUNT II
## (Breach of Contract against Ascensus)

56.    U-Nest incorporates paragraphs 1-55 as if fully set forth herein.

57.    Ascensus has breached the *Settlement Agreement* by refusing to facilitate U-Nest's
       ability to rollover its RI Program accounts as required by the cooperation provision and
       other terms of the *Settlement Agreement.*

58.    Ascensus has breached the *Settlement Agreement* by actively working to prevent UI-
       Nest from being able to rollover its RI Program accounts into the NY Program.

59.    Ascensus has also breached the implied covenant of good faith and fair dealing.

- 12 -

60.     U-Nest has suffered actual damages as a result of Ascensus' breach of the *Settlement Agreement.*

### PRAYER FOR RELIEF IN CONNECTION WITH COUNTS I AND II

WHEREFORE, U-Nest hereby demands Judgment in its favor, and against Ascensus, and requests the following relief:

(a)     A temporary, preliminary, and/or permanent injunction that, among other things:

(i.)     Extends U-Nest's access to accounts currently opened with the RI Program (approximately 500) preliminarily to continue through at least June 30, 2020 (currently provided through December 31, 2019, in the *Settlement Agreement*), and forbid during that extension period any correspondence to U-Nest's clients other than from U-Nest, consistent with the *Settlement Agreement*;

(ii.)     Orders Ascensus to identify to U-Nest and this Court any and all statements that it made to JPM in connection with U-Nest's involvement in the NY Program, including who made them, when they were made, to whom they were made, and the precise substance of such statements, and do so no later than December 31, 2019;

(iii.)     Orders Ascensus to identify a state with a 529 plan that it manages other than RI or NY (Plaintiff understands that Ascensus has approximately 66% of the states under management) to which it is willing to ultimately allow U-Nest to roll its current RI Program and NY Program accounts for a longer period of time – such as a full

- 13 -

year – in order for U-Nest to find a permanent plan in which these accounts can be invested;

(iv.) Any such other relief as the Court may find to be appropriate.

(b) Order Ascensus to pay all of U-Nest's attorneys' fees and costs arising after Ascensus' breach of the *Settlement Agreement*, and in connection with this Motion;

(c) Compensatory damages in an amount exceeding $75,000.00;

(d) Pre-judgment interest; and

(e) Any and all such further relief which this Court shall deem just and proper under the circumstances.

## COUNT III
### (Sherman Act § 2)

61. U-Nest incorporates paragraphs 1-60 as if fully set forth herein.

62. Ascensus is the dominant provider of management services to government-sponsored tax exempt 529 college savings plans ("529 plans"), such as the RI Program and NY Program.

63. Ascensus provides such management services to, on information and belief, 29 or 30 of approximately 45 such plans nationwide, resulting in a market share between 65%-70%; it is believed that Ascensus has had this market dominance for a number of years.

64. Indeed, Ascensus serves as the manager for the 529 plans sponsored by Rhode Island and New York (defined above as the "RI Program" and the "NY Program", respectively).

- 14 -

65. Ascensus also, on information and belief, has a 100% market share in the states in which it contracts to serve as manager for that state's 529 plan.  In other words, once installed as a state's 529 plan manager by contract, Ascensus is the only manager of that state's 529 plan, and serves as "gatekeeper" of any and all access and interaction with such 529 plan.

66. By either measure, the 65-70% nationwide share, or the 100% share on a state-by-state basis, Ascensus has market power, or monopoly power, in the management of 529 plans, and that power extends to the RI Program and NY Program.

67. Ascensus has engaged in anticompetitive conduct by abusing its market or monopoly power and its role as gatekeeper to 529 plans and, particularly, the RI Program and the NY Program, in order to exclude U-Nest from the market for the provision of financial advice to investors in 529 plans (families saving for college tuition) and from innovating in the 529 plan management market.

68. In order for U-Nest to participate in the market for the provision of financial advice to investors in 529 plans, and to potentially innovate in the 529 plan management market, it has no choice but to deal with Ascensus in the 65-70% of states where Ascensus serves as manager.

69. Ascensus is also dominant from a different perspective:  Ascensus' management of 529 plans appears to be so essential to the states sponsoring those 529 plans that such states would forego dealing with competing brands or potentially competing innovators such as U-Nest in order to keep the dominant manager – Ascensus – installed as manager. While this may change over time, there is no sign of it changing in the near future.

- 15 -

70.    Ascensus apparently determined that U-Nest was a threat to its business model, perhaps because Ascensus is concerned that U-Nest could eventually erode Ascensus' market power and replace Ascensus altogether with its innovative application for opening and servicing of 529 plan accounts.

71.    Alternatively, it is possible that Ascensus is developing and plans to launch a mobile application that would compete directly with U-Nest's, and Ascensus has determined to use its market power in the management of 529 plans to squash U-Nest before U-Nest achieves a more meaningful share of the market for the provision of financial advice to investors in 529 plans.

72.    As set forth herein, Ascensus has and has had an existing relationship with U-Nest in connection with the RI Program and the NY Program.

73.    Ascensus first terminated or caused to be terminated the *RI Selling Agreement* and then, subsequent to the execution of the *Settlement Agreement*, terminated or caused to be terminated the selling agreement in connection with the NY Program.

74.    Ascensus' actions have materially harmed and will materially harm, if not enjoined by this Court, U-Nest's ability to continue participate in the market for the provision of financial advice to investors in 529 plans and to potentially innovate in the 529 plan management market

75.    In sum, Ascensus, by virtue of its market power as manager of 529 plans nationwide and on a state-by-state basis, has the power to block or close off access to U-Nest's ability to provide account opening services and investment advice to end user consumers of 529 plans, or to innovate with respect to the servicing of those plans or the management of 529 plans.

- 16 -

76.     Ascensus did just that with respect to the RI Program, and by virtue of its anticompetitive post-*Settlement Agreement* conduct in connection with the NY Program, is working to exclude U-Nest from the nationwide market for the provision of financial advice to investors in 529 plans.

77.     Ascensus' anticompetitive post-*Settlement Agreement* conduct in connection with the NY Program includes, among potentially other things, (1) the apparent defamation of U-Nest to JPM in the form of SEC irregularities or issues in order to cause JPM to inform Ascensus of a termination of the NY Program selling agreement, and (2) the so-called identification by Ascensus of issues or concerns with long-established RI Program accounts that Ascensus has had custody of for many months, which issues were suddenly worth flagging to JPM once Ascensus realized U-Nest would use the NY Program for its 529 plan financial advisory accounts going forward.

78.     Ascensus took the above-summarized anticompetitive actions with the intent of harming both U-Nest's NY Program investment account holders as well as its RI Program investment account holders, all 500+ of whom Ascensus has now placed in financial advisory purgatory by way of its deprivation of an available plan for rollover purposes.

79.     Furthermore, Ascensus is an essential facility, that is, it is in position as monopolist of the 529 plan management market to eliminate competition in a downstream market by preventing downstream competitors from accessing the facility.

80.     The facilities at issue are 529 plans nationwide and, separately, the NY Program and the RI Program. The downstream market is the market for the provision of financial advice to investors in 529 plans (families saving for college tuition).

- 17 -

81.     U-Nest, and other financial advisors to investors in 529 plans, cannot reasonably recreate access to 529 plans in states that Ascensus manages without going through Ascensus.

82.     Ascensus has denied that access *without any legitimate business purpose therefor*; while Ascensus will claim as a transparent pretext that certain accounts open by U-Nest had irregularities, these are minor issues germane to the opening of such accounts generally (uses of maiden names, grandparent names, including a third party bank, errors on a SSN) that U-Nest asserts do not happen more frequently with U-Nest accounts than with accounts opened by other financial advisors.

83.     As further support that there is no legitimate business purpose for Ascensus' conduct, U-Nest was examined, or audited, by the SEC earlier this year and cleared as fully compliant with SEC rules and regulations.

84.     The conduct alleged in this First Amended Complaint caused antitrust injury to U-Nest, specifically by, without limitation, preventing U-Nest from continuing on as Financial Advisor to its RI Program account clients and its NY Program account clients, by preventing U-Nest from rolling its RI Program account clients into the NY Program consistent with the Parties' *Settlement Agreement*, and by preventing U-Nest from providing financial advisory services to investors in connection with any other 529 plan.

85.     In sum, Ascensus is blocking U-Nest from participating in the market for the provision of financial advice to investors in 529 plans (families saving for college tuition) in Rhode Island, New York, and nationwide through its position as gatekeeper for this plans.

- 18 -

86.     Ascensus's conduct constitutes the unlawful establishment, maintenance or use of a monopoly in the relevant market for the provision of management services to 529 plans nationwide in violation of Section 2 of the Sherman Act.

87.     As a direct and proximate result of Ascensus' monopolization of the market for the relevant market for the provision of management services to 529 plans nationwide in violation of Section 2 of the Sherman Act, U-Nest has suffered injury to its business and property and seeks damages in an amount to be proven at trial.

### PRAYER FOR RELIEF IN CONNECTION WITH COUNT III

WHEREFORE, U-Nest hereby prays that this Court:

(a)     Enjoin, on an emergency basis, all anticompetitive conduct of Ascensus;

(b)     Enter judgment for U-Nest on Count III;

(c)     Adjudge and declare that U-Nest has engaged in unlawful conduct in violation of Section 2 of the Sherman Act;

(d)     Award U-Nest damages in an amount to be proven at trial, with damages for its violation of Section 2 of the Sherman Act to be trebled with interest; and

(e)     Award U-Nest the costs of this suit, including the expenses of discovery and document production, and its reasonable attorneys' fees.

## DEMAND FOR TRIAL BY JURY

Pursuant to *Federal Rule of Civil Procedure* 38(b), U-Nest hereby demands a

trial by jury on all issues so triable.

U-NEST HOLDINGS, INC.

By its Attorneys,

*/s/ Joseph A. Farside, Jr.*
Joseph A. Farside, Jr., Esq. (#7559)
Krystle G. Tadesse, Esq. (#7944)
Samantha M. Vasques, Esq. (#9386)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
joseph.farside@lockelord.com
krystle.tadesse@lockelord.com
samantha.vasques@lockelord.com

Dated:  December 23, 2019

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 23rd day of December, 2019, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be mailed to those indicated as non-registered participants.

*/s/ Joseph A. Farside, Jr.*

81830458v.3