# Exhibit D

| | |
|---|---|
| STATE OF RHODE ISLAND<br>PROVIDENCE, SC. | SUPERIOR COURT |

| | |
|---|---|
| U-NEST HOLDINGS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>INVESCO DISTRIBUTORS, INC. and<br>ASCENSUS COLLEGE SAVINGS<br>RECORDKEEPING SERVICES, LLC,<br><br>        Defendants. | C.A. No. |

## VERIFIED COMPLAINT

Plaintiff, U-Nest Holdings, Inc. ("U-Nest"), by and through its undersigned attorneys, hereby brings this Complaint against defendants Invesco Distributors, Inc. ("Invesco") and Ascensus College Savings Recordkeeping Services, LLC ("Ascensus").

### Introduction

U-Nest seeks a temporary restraining order and preliminary injunction against unjustified conduct threatened upon U-Nest by Defendants to commence on December 1, 2019 that would be irreparably harmful and damaging to U-Nest's end-user account holders and U-Nest's business reputation. Defendants are managers and distributors of certain tax-exempt college savings investment plans sponsored by the State of Rhode Island. U-Nest operates a mobile application in connection with such investment plans and is a marketer of such plans to end-users who are individuals saving money for the college tuitions of their children or relatives. This lawsuit is necessary to prevent the imminent and unlawful restriction by Defendants of the ability of those end-users to access their accounts in the matter for which they have specifically contracted with U-Nest for. The conduct threatened by Defendants is unlawful and appears to be for punitive

81721404v.5

purposes only. Injunctive relief is required to prevent U-Nest's end-user customers from being denied access to their individual savings accounts on December 1, 2019, and beyond.

## Allegations

### Parties

1. Plaintiff U-Nest is a corporation incorporated under the laws of the state of Delaware with its principal place of business located at 2920 West Olive Avenue, Burbank, California 91505.

2. Defendant Invesco is a corporation incorporated under the laws of the state of Delaware with its principal place of business located at 11 Greenway Plaza, Suite 1000, Houston, Texas 77046.

3. Defendant Ascensus is a limited liability corporation with its principal place of business located at 95 Wells Avenue, Suite 160, Newton, Massachusetts 02459.

### Jurisdiction and Venue

4. Jurisdiction is appropriate in this Court. The operative contract between the parties states that the courts of the State of Rhode Island and the United States District Court for the District of Rhode Island have exclusive jurisdiction over any and all disputes arising out of the contract.

5. Venue is proper in this Court pursuant to *R.I. Gen. Laws* §§ 9-4-3 and/or 9-4-4.

### Facts

*Parties*

6. U-Nest is a mobile application for iPhone that allows end-user account holders to save for their children's education *via* a tax-advantaged 529 college savings plan. U-Nest also markets such plans to prospective end-user account holders.

7. The CollegeBound 529 ("Program") is a qualified tuition program governed by Section 529 of the Internal Revenue Code of 1986, as amended, sponsored by the State of Rhode Island and Providence Plantations and administered by the Rhode Island Office of the General Treasurer.

8. Ascensus is the program manager for the Program ("Program Manager") pursuant to a *Program Management Agreement* between the Treasurer and the Program Manager dated March 18, 2016.

9. Invesco is the distributor of the Program pursuant to a *Services Agreement* between the Program Manager and Invesco.

***Agreement for Recommending 529 Plan Securities***

10. On or about May 7, 2018, U-Nest[1] and Invesco entered into an *Agreement for Recommending 529 Plan Securities* ("*Agreement*"). A copy of the *Agreement* is attached hereto as **Exhibit A** and incorporated herein by reference.

11. In October 2018, U-Nest launched its mobile application and began marketing 529 plans to potential end-user account holders.

12. Under the *Agreement*, U-Nest was authorized to recommend, on a non-exclusive basis, Invesco-managed municipal fund securities ("Program Interests") that are in the Program.

13. U-Nest end-user account holders sign an *Advisory Agreement Terms and Conditions* ("*Advisory Agreement*") when they contract to use U-Nest's services. A copy of the form of such *Advisory Agreement* is attached hereto as **Exhibit B** and incorporated herein by reference.

---

[1] U-Nest was converted from a limited liability company to a Delaware corporation in July 2019.

14. Under the terms of the *Advisory Agreement*, end-user account holders provide U-Nest with a limited power of attorney and appoint U-Nest as their attorney-in-fact and agent to interface with 529 plans.

15. The *Agreement* expressly acknowledges that U-Nest contracts directly with end-user account holders to provide services. *Agreement* § 1(e)(ii).

16. The *CollegeBound 529 Non-Rhode Island Resident Enrollment Form* ("*Program Enrollment Form*") allows the end-user to designate the Financial Advisor of their choosing, providing that designated Financial Advisor with authority to access their account and the ability to perform transactions on their behalf. A copy of the *Program Enrollment Form* is attached hereto as **Exhibit C** and incorporated herein by reference.

17. The selection of U-Nest as the end-user's Financial Advisor on the *Program Enrollment Form* allows U-Nest to access a Program client / advisor portal on the end-user account holder's behalf and to make transactions.

18. Page 6 of the *Program Enrollment Form* lists a number of Invesco portfolios as investment options. In addition, page 10 makes a number of disclosures regarding Ascensus and Invesco. Lastly, page 11 contains Ascensus and Invesco logos.

19. Many of U-Nest's end-user account holders are close friends, family, business partners, advisors and investors in U-Nest.

*Marketing*

20. Under the *Agreement* (§ 1(a)), U-Nest is permitted to recommend the Program Interests to prospective end-user account holders. Section 4 of the *Agreement* provides in relevant part that "[U-Nest] will not use nor allow its representatives, employees, partners, joint venturers or agents to use the name of [Invesco] or the name of any of

their affiliates, [Ascensus], or any Governmental Authority (including any trademark, trade name, service mark or logo) without [Invesco's] prior consent except as required by law."

21. Pursuant to Section 4 of the *Agreement,* U-Nest sent proposed marketing materials that included Invesco's logo and trademarks to Invesco for review and approval.

22. U-Nest never received a response from Invesco regarding the proposed marketing materials, so it removed the Invesco logos and trademarks from the marketing materials and proceeded with marketing the Program Interests without Invesco's labeling thereon.

23. U-Nest noted in its marketing materials and related disclosures that the plans that it was marketing were managed by Invesco solely in order to comply with federal and state securities laws regarding such disclosures.

***Termination of the Agreement***

24. The *Agreement* allows either party to terminate, without penalty, on thirty (30) days' prior written notice to the other party. *Agreement* § 6(b).

25. The *Agreement* also allows either party to terminate the *Agreement* immediately, without notice, if the other party breaches.

26. In a letter dated October 31, 2019, delivered *via* overnight courier, Invesco provided written notice that it was terminating the *Agreement* effective November 30, 2019 ("*Termination Letter*"). A copy of the *Termination Letter* is attached hereto as **Exhibit D** and incorporated herein by reference.

27. The *Termination Letter* stated that Invesco was terminating the *Agreement* because U-Nest used the Invesco name in its marking materials, including its website and digital

81721404v.5

application description, without the advance written consent of Invesco, as required under Section 4 of the *Agreement*.

28. While the *Termination Letter* alleged that U-Nest was in breach of the *Agreement*, Invesco did not terminate the *Agreement* immediately and without notice as permitted by Section 6(c) of the *Agreement* in the event of a breach.

29. As a result of the *Termination Letter*, U-Nest timely contacted Invesco to ensure that U-Nest is able to maintain uninterrupted access to the client / advisor portal on behalf of end-user account holders with whom they contracted to serve as their Financial Advisor prior to the termination date (November 30). Specifically, on November 1, 2019, a representative from U-Nest spoke with a representative from Invesco. Based on that conversation, U-Nest was initially under the impression that there would not be any interruption to existing end-user account holders.

30. During a telephone call on or about November 20, 2019, representatives of Invesco and Ascensus informed U-Nest that its access to the client /advisor portal will be terminated and/or otherwise limited when the *Agreement* is terminated effective November 30, 2019.

31. During that phone call, U-Nest was advised that there was no flexibility on the termination date and that the affected approximately 500 end-user account holders (the savers for college tuition who invested in the plan through efforts of U-Nest) would become Invesco-labeled accounts.

32. On or about November 21, 2019, U-Nest's counsel spoke with Invesco representatives who told counsel that any issues needed to be discussed with Ascensus because Ascensus, not Invesco, controls access to the client / advisor portal.

33. To date, Ascensus has refused to engage with U-Nest on how to ensure that U-Nest has continuing access to the client / advisor portal post-termination, and has directed U-Nest to engage with Invesco, which has in turn refused to engage further with U-Nest.

34. U-Nest should continue to have uninterrupted access and rights to continue servicing their end-user account holders who are already in the Program through the client / advisor portal for which those end-user account holders have specifically contracted as described above.

## Count I
### (Injunctive Relief against Invesco and Ascensus)

35. U-Nest incorporates paragraphs 1-34 as if fully set forth herein.

36. U-Nest will be permanently and irreparably harmed if Invesco and Ascensus are allowed to terminate and/or otherwise limit U-Nest's access and rights to the client / advisor portal on behalf of U-Nest's end-user clients who are currently enrolled in the Program.

37. U-Nest has no adequate remedy at law because its approximately 500 end-user account holders will have no access to their Program accounts and U-Nest will suffer irreparable harm to its business, reputation, and end-user relationships if Invesco and Ascensus are permitted to end U-Nest's access and rights to the Program's client / advisor portal on behalf of end-user relationships that came into existence before termination of the *Agreement.*

38. The reputational harm to U-Nest if Invesco and Ascensus are permitted to terminate U-Nest's access to end-user accounts will be particularly damaging because many of U-Nest's end-user account holders are close friends, family, business partners, advisors and investors in U-Nest.

81721404v.5

39. U-Nest has a substantial likelihood of success on the merits of this claim.

40. Based on the irreparable harm that U-Nest has suffered, and will continue to suffer, U-Nest has no adequate remedy at law with regard to Invesco and Ascensus' ongoing conduct and is entitled to injunctive relief.

### Count II
### (Breach of Implied Warranty of Good Faith and Fair Dealing against Invesco)

41. U-Nest incorporates paragraphs 1-40 as if fully set forth herein.

42. Invesco has breached an implied warranty of good faith and fair dealing contained in the *Agreement* by indicating that it will terminate U-Nest's access to the Program's client / advisor portal on behalf of U-Nest's approximately 500 end-user account holders and converting those accounts Invesco-labeled accounts.

43. U-Nest will suffer actual damages as a result of Invesco's breach of the implied warranty of good faith and fair dealing upon such termination.

### Count III
### (Tortious Interference with Contractual Relations against Invesco and Ascensus)

44. U-Nest incorporates paragraphs 1-43 **Error! Reference source not found.Error! Reference source not found.**as if fully set forth herein.

45. As set forth in greater detail above, Invesco and Ascensus have intentionally and wrongfully interfered with U-Nest's *Advisory Agreements* with end-users by threatening to end U-Nest's access to the Program's client / advisor portal on behalf of those end-user account holders and unilaterally converting those 500 end-user accounts Invesco-labeled accounts. Invesco and Ascensus' conduct constitutes tortious interference with U-Nest's contractual relations.

46. Invesco and Ascensus' interference with U-Nest's contractual relationships with end-users is intentional and with malice, and without any other justification.

47. As a result of Invesco and Ascensus' tortious interference with U-Nest's contractual relations with end-user account holders, U-Nest will suffer actual damages.

48. Invesco and Ascensus' tortious interference with U-Nest's contractual relations, as set forth in detail above, will continue to cause U-Nest irreparable harm to their business, reputation, and client relationships.

49. U-Nest has a substantial likelihood of success on the merits of this claim.

50. Based on the irreparable harm that U-Nest will suffer, U-Nest has no adequate remedy at law with regard to Invesco and Ascensus' ongoing conduct and are entitled to injunctive relief.

## Count IV
### (Unjust Enrichment against Invesco and Ascensus)

51. U-Nest incorporates paragraphs 1-50 **Error! Reference source not found.Error! Reference source not found.**as if fully set forth herein.

52. As set forth more fully above, Invesco and Ascensus have engaged in inequitable conduct, for the purpose of enriching themselves, to U-Nest's substantial detriment.

53. Invesco and Ascensus' actions, as set forth above, have conferred a benefit on Invesco and Ascensus in the form of their conversion of approximately 500 end-user accounts that were originated by U-Nest to Invesco-labeled accounts. That conduct has resulted in Invesco and Ascensus obtaining business opportunities, revenues and profits improperly diverted from U-Nest, for which U-Nest has not been compensated.

54. As a direct and proximate result of Invesco and Ascensus' conduct as set forth in detail above, Invesco and Ascensus will be unjustly enriched to U-Nest's substantial detriment.

55. Invesco and Ascensus' unjust enrichment, as set forth in detail above, has caused U-Nest to sustain substantial damages.

### Count V
### (Breach of Contract against Invesco and Ascensus)

56. U-Nest incorporates paragraphs 1-55 **Error! Reference source not found.Error! Reference source not found.**as if fully set forth herein.

57. U-Nest is the intended beneficiary of the *Program Enrollment Contract*.

58. Invesco and Ascensus have breached the *Program Enrollment Contract* by indicating that they will terminate U-Nest's access to the Program's client / advisor portal on behalf of U-Nest's approximately 500 end-user account holders on November 30, 2019.

59. U-Nest has suffered actual damages as a result of Invesco and Ascensus' breach of the *Program Enrollment Contract*.

WHEREFORE, U-Nest hereby demands Judgment in its favor, and against Invesco and Ascensus, and requests the following relief:

(a) A temporary, preliminary, and/or permanent injunction restraining and enjoining Invesco and Ascensus from terminating and/or otherwise limiting U-Nest's access and rights to continue servicing their end-user clients who are already in the Program;

(b) Compensatory damages;

(c) Pre-judgment interest;

(d) U-Nest's reasonable attorneys' fees and costs of suit; and

(e) Any and all such further relief which this Court shall deem just and proper under the circumstances.

U-NEST HOLDINGS, INC.

By its Attorneys,

*/s/ Joseph A. Farside, Jr.*
Joseph A. Farside, Jr., Esq. (#7559)
Krystle G. Tadesse, Esq. (#7944)
LOCKE LORD LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (fax)
joseph.farside@lockelord.com
krystle.tadesse@lockelord.com

Dated: November 25, 2019

81721404v.5

## VERIFICATION

I, Ksenia Yudina, being duly sworn, depose and state that I am Chief Executive Officer of U-Nest Holdings, Inc. I have read the foregoing complaint and state that the matters contained therein are true and accurate to the best of my personal knowledge, except to matters stated upon information and belief, and I believe those matters to be true.

_____  11/24/2019
Ksenia Yudina

Subscribed and sworn to before me this 24th day of November, 2019.

Nurfer Turker
_____
Notary Public

My commission expires: May 23, 2020

_____

see attachment for Jurat

Nurfer Turker
11-24-2019

Verification - 1

1" = "1" "81721691v.1" "" 81721691v.1

# JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of __Los Angeles__

Subscribed and sworn to (or ~~affirmed~~) before me on this __24th__ day of __November__, 20__19__ by __Ksenia Yudina__,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Signature                    (Seal)

NURFER TURKER
COMM. # 2154354
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 23, 2020

---

## OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

__Verification__
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages __1__  Document Date __11-24-19__

_____
Additional information

## INSTRUCTIONS

The wording of all Jurats completed in California after January 1, 2015 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one with does contain the proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.

- State and county information must be the state and county where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of the document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document with a staple.

2015 Version www.NotaryClasses.com 800-873-9865