# Exhibit E

| | |
|---|---|
| STATE OF RHODE ISLAND<br>PROVIDENCE, SC. | SUPERIOR COURT |

| | |
|---|---|
| U-NEST HOLDINGS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>INVESCO DISTRIBUTORS, INC. and<br>ASCENSUS COLLEGE SAVINGS<br>RECORDKEEPING SERVICES, LLC,<br><br>        Defendants. | C.A. No. |

**PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Rule 65 of the *Rhode Island Superior Court Rules of Civil Procedure*, plaintiff U-Nest Holdings, Inc. ("U-Nest") hereby submits this memorandum of law in support of its motion for a temporary restraining order against defendants Invesco Distributors, Inc. ("Invesco") and Ascensus College Savings Recordkeeping Services, LLC ("Ascensus").

In its *Verified Complaint*, U-Nest has asked this Court to, among other things, issue an order preventing Invesco and Ascensus from terminating and/or otherwise limiting U-Nest's access and rights to a client / advisor portal administered / distributed by Defendants.  U-Nest now moves this Court for a temporary restraining order restraining and preventing Invesco and Ascensus from taking any action to end and/or otherwise limit U-Nest's access to the client / advisor portal for purposes of servicing U-Nest's end-user account holders who are currently participating in the college savings program administered and distributed by Defendants.  A temporary restraining order in this instance would merely act to preserve the status quo.

**BACKGROUND**

The following facts are taken from the *Verified Complaint* filed by U-Nest.

**A.     Parties**

U-Nest is a mobile application for iPhone and Android that allows end-user account holders to save for their children's education *via* a tax-advantaged 529 college savings plan. *Verified Complaint* ("*Compl.*") ¶ 6.  U-Nest also markets such plans to prospective end-user account holders. *Id.*  The CollegeBound 529 ("Program") is a qualified tuition program governed by Section 529 of the Internal Revenue Code of 1986, as amended, sponsored by the State of Rhode Island and Providence Plantations and administered by the Rhode Island Office of the General Treasurer. *Id.* ¶ 7.  Ascensus is the program manager for the Program ("Program Manager") pursuant to the *Program Management Agreement* between the Treasurer and the Program Manager dated March 18, 2016. *Id.* ¶ 8.  Invesco is the distributor of the Program pursuant to a *Services Agreement* between the Program Manager and Invesco. *Id.* ¶ 9.

**B.     *Agreement for Recommending 529 Plan Securities***

On or about May 7, 2018, U-Nest[1] and Invesco entered into an *Agreement for Recommending 529 Plan Securities* ("*Agreement*"). *Compl.* ¶ 10.  A copy of the *Agreement* is attached hereto as **Exhibit A** and incorporated herein by reference.  In October 2918, U-Nest launched its mobile application and began marketing 529 plans to potential end-user account holders. *Id.* ¶ 11.  Under the *Agreement*, U-Nest was authorized to recommend, on a non-exclusive basis, Invesco-managed municipal fund securities that are in the Program ("Program Interests"). *Id.* ¶ 12.  U-Nest's end-user account holders sign an *Advisory Agreement Terms and Conditions*

---

[1] U-Nest was converted from a limited liability company to a Delaware corporation in July 2019.

("*Advisory Agreement*").  *Id.* ¶ 13.  A copy of the *Advisory Agreement* is attached hereto as **Exhibit B** and incorporated herein by reference.

Under the terms of the *Advisory Agreement*, end-user account holders provide U-Nest with a limited power of attorney and appoint U-Nest as their attorney-in-fact and agent to interface with 529 plans.  *Id.* ¶ 14.  The *Agreement* expressly acknowledges that U-Nest contracts directly with end-user account holders to provide services.  *Agreement* § 1(e)(ii).  *Id.* ¶ 15.  The *CollegeBound 529 Non-Rhode Island Resident Enrollment Form* ("*Program Enrollment Form*") allows the end-user account holders to designate the Financial Advisor of their choosing, providing that designated Financial Advisor with authority to access their account and the ability to perform transactions on their behalf.  *Id.* ¶ 16.  A copy of the *Program Enrollment Form* is attached hereto as **Exhibit C** and incorporated herein by reference.  The selection of U-Nest as the end-user account holder's Financial Advisor allows U-Nest to access a Program client / advisor portal on the end-user account holder's behalf and to make transactions in connection with their college savings accounts.  *Id.* ¶ 17.

Page 6 of the *Program Enrollment Form* lists a number of Invesco portfolios as investment options.  In addition, page ten makes a number of disclosures regarding Ascensus and Invesco.  Lastly, page 11 contains Ascensus and Invesco logos.  *Id.* ¶ 18.  Many of U-Nest's end-user account holders are close friends, family, business partners, advisors and investors in U-Nest.  *Id.* ¶ 19.

C.     **Marketing**

Under the *Agreement* (§ 1(a)), U-Nest is permitted to recommend the Program Interests to prospective end-user account holders.  *Compl.* ¶ 20.  Section 4 of the *Agreement* provides in relevant part that

- 3 -

> [U-Nest] will not use nor allow its representatives, employees, partners, joint venturers or agents to use the name of [Invesco] or the name of any of their affiliates, [Ascensus], or any Governmental Authority (including any trademark, trade name, service mark or logo) without [Invesco's] prior consent except as required by law.

*Id.* Pursuant to Section 4 of the *Agreement,* U-Nest sent proposed marketing materials that included Invesco's logo and trademarks to Invesco for review and approval. *Id.* ¶ 21. U-Nest never received a response from Invesco regarding the marketing materials, so it removed the logos and trademarks from the marketing materials and proceeded with the marketing without Invesco's labeling thereon. *Id.* ¶ 22. U-Nest noted that the plans that it was marketing were managed by Invesco as investment manager in order to comply with securities laws regarding disclosures. *Id.* ¶ 23.

### D.     Termination of the Agreement

The *Agreement* allows either party to terminate, without penalty, on thirty (30) days' prior written notice to the other party. *Agreement* § 6(b). *Compl.* ¶ 24. The *Agreement* also allows either party to terminate the *Agreement* immediately, without notice, if the other party breaches. *Id.* ¶ 25. In a letter dated October 31, 2019, delivered *via* overnight courier, Invesco provided written notice that it was terminating the *Agreement* effective November 30, 2019 ("*Termination Letter*"). *Id.* ¶ 26. A copy of the *Termination Letter* is attached hereto as **Exhibit D** and incorporated herein by reference.

The *Termination Letter* stated that Invesco was terminating the *Agreement* because U-Nest used the Invesco name in its marking materials, including its website and digital application description, without the advance written consent of Invesco, as required under Section 4 of the *Agreement*. *Compl.* ¶ 27. While the *Termination Letter* alleged that U-Nest was in breach of the *Agreement,* Invesco did not terminate the *Agreement* immediately and without notice as permitted

by Section 6(c) of the *Agreement* in the event of a breach.  *Id.* ¶ 28.  As a result of the *Termination Letter*, U-Nest timely contacted Invesco to ensure that U-Nest is able to maintain uninterrupted access to the client / advisor portal on behalf of end-user account holders with whom they contracted to serve as their Financial Advisor prior to the termination date (November 30).  Specifically, on November 1, 2019, a representative from U-Nest spoke with a representative from Invesco.  *Id.* ¶ 29.  Based on that conversation, U-Nest was initially under the impression that there would not be any interruption to existing end-user account holders.  *Id.*

During a telephone call on or about November 20, 2019, representatives of Invesco and Ascensus informed U-Nest that its access to the client /advisor portal will be terminated and/or otherwise limited when the *Agreement* is terminated effective November 30, 2019.  *Compl.* ¶ 30.  During that phone call, U-Nest was advised that there was no flexibility on the termination date and that the affected approximately 500 end-user account holders (the savers for college tuition who invested in the plan through efforts of U-Nest) would become Invesco-labeled accounts.  *Id.* ¶ 31.  On or about November 21, 2019, U-Nest's counsel spoke with Invesco representatives who told counsel that any issues needed to be discussed with Ascensus because Ascensus, not Invesco, controls access to the client / advisor portal.  *Id.* ¶ 32.

To date, Ascensus has refused to engage with U-Nest on how to ensure that U-Nest has continuing access to the client / advisor portal post-termination, and has directed U-Nest to engage with Invesco, which has in turn refused to engage further with U-Nest.  *Id.* ¶ 33.  Approximately 500 end-user account holders will be impacted if Defendants are permitted to terminate U-Nest's access to their accounts.  U-Nest can provide information about the 500 end-user account holders under a protective order if the Court would like to review.  U-Nest should continue to have uninterrupted access and rights to continue servicing their end-user account holders who are

81721436v.3

already in the Program through the client / advisor portal for which those end-user account holders have specifically contracted as described above.   *Id.* ¶ 34.

## PROCEDURAL POSTURE

U-Nest has filed a *Verified Complaint* asking this Court to, among other things, issue an order preventing Invesco and Ascensus from terminating U-Nest's access and rights to the client / advisor portal so that it can continue servicing its end-user account holder clients who are already in the Program.  U-Nest now moves this Court for a temporary order restraining and preventing Invesco and Ascensus from taking any action to terminate and/or otherwise limit U-Nest's access to the client / advisor portal.

## ARGUMENT

"In order to qualify for a temporary restraining order, the moving party must demonstrate (1) that it will probably succeed on the merits of its claim, (2) that the party will suffer immediate irreparable harm absent injunctive relief, (3) that the moving party has no adequate remedy at law, and (4) taking into account the public interest, the balancing of the equities favors the granting of the temporary restraining order." *Martin v. Lincoln Bar, Inc.*, 622 A.2d 464, 469 (R.I. 1993).  An application for temporary injunctive relief is addressed to this Court's sound discretion. *Fund for Cmty. Progress v. United Way of Southeastern New Eng.*, 695 A.2d 517, 521 (R.I. 1997).

**A.**     **Likelihood of Success on the Merits.**

With regard to the first prong, U-Nest has demonstrated a likelihood of success on the merits.  As set forth in its *Verified Complaint*, Invesco and Ascensus have refused to engage with U-Nest to determine a plan to ensure that U-Nest maintains access post-termination to the client / advisor portal on behalf of the end-user account holders with whom they have contracted prior to the termination date.  Instead, Ascensus indicated such access would be terminated as of December

1, 2019.  Those end-user account holders have designated U-Nest as their Financial Advisor, and they are entitled to have U-Nest continue to serve in that capacity on their behalf, regardless of whether the *Agreement* remains in effect.   U-Nest has a contractual right to access the client / advisor portal through both the *Advisory Agreements* with end-user account holders and the end-user's enrollment with Defendants through the *Program Enrollment Form*.  Termination of the *Agreement* does not affect U-Nest's access to the client \ advisor portal – it only precludes U-Nest form offering the Program going forward.  U-Nest should have uninterrupted access and rights to continue servicing their end-user account holder clients through the client / advisor portal who are currently in the Program.

**B.** **Irreparable Harm.**

With regard to the second prong, the irreparable harm here is clear.  If Invesco and/or Ascensus are permitted to terminate or otherwise limit U-Nest's access to the client / advisor portal, approximately 500 end-user account holders will effectively see their contractual advisory relationship with U-Nest severed, preventing end-user account holders from accessing details of their account through the U-Nest application and precluding U-Nest from its ability to perform its rights and responsibilities under the *Advisory Agreement*.  Instead, U-Nest end-user account holder clients desiring any access or service for their accounts will be required to interact directly with Ascensus by phone or its own online portal for Program account owners.  U-Nest will suffer undue embarrassment and harm to its business reputation and ability to market other plans to end-user account holders.  This is particularly true because many of U-Nest's end-user account holders are close friends, family, business partners, advisors and investors in U-Nest. The effect on U-Nest's business would be irreparable.

### C. No Adequate Remedy at Law.

U-Nest has no adequate remedy at law. In the absence of injunctive relief, U-Nest's approximately 500 end-user account holder clients will have no access to their Program accounts through the U-Nest application or U-Nest employees after November 30, 2019. In addition, U-Nest will suffer irreparable harm to its business, reputation and end-user account holder relationships if Invesco and Ascensus are permitted to terminate U-Nest's access and rights to the Program's client / advisor portal on behalf of end-user account holder relationships that came into existence before the date of termination of the *Agreement*.

### D. Balancing of the Equities.

Finally, granting the temporary restraining order will not prejudice or unduly burden Invesco or Ascensus. U-Nest's approximately 500 end-user account holder clients are part of the Program administered by Ascensus and distributed by Invesco. The end-user account holders will continue to be part of the Program after termination of the *Agreement*. The end-user account holders have selected U-Nest as their Financial Advisor, and U-Nest should be permitted to continue to access the end-user account holders' accounts and to transact business on behalf of them as part of what the end-user account holders bargained for by enrolling in the Program.

Granting this motion will only require Invesco and Ascensus to maintain the status quo. Invesco and Ascensus will not be unduly burdened or prejudiced if it they are restrained from taking action to terminate or otherwise limit U-Nest's access to the client / advisor portal. By contrast, if injunctive relief is denied, U-Nest will suffer irreparable harm to its business and reputation as described previously. Accordingly, the balancing of the equities weighs in favor of granting injunctive relief.

81721436v.3

## **CONCLUSION**

For the reasons stated above and for those that may be advanced at oral argument, U-Nest requests that this Court grant its Motion for Temporary Restraining Order.

        PLAINTIFF,

        U-NEST HOLDINGS, INC.,

        By its Attorneys,

        */s/ Joseph A. Farside, Jr.*
        Joseph A. Farside, Jr., Esq. (#7559)
        Krystle G. Tadesse, Esq. (#7944)
        LOCKE LORD LLP
        2800 Financial Plaza
        Providence, RI 02903
        (401) 274-9200
        (401) 276-6611 (fax)
        joseph.farside@lockelord.com
        krystle.tadesse@lockelord.com

Dated: November 25, 2019