UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

U-NEST HOLDINGS, INC.,                    :
                                          :
                 Plaintiff,               :
                                          :
v.                                        :      C.A. No. 1:19-CV-00659-WES-PAS
                                          :
ASCENSUS COLLEGE SAVINGS                  :
RECORDKEEPING SERVICES, LLC,              :
                                          :
                 Defendant.               :
                                          :

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION
TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Defendant Ascensus College Savings Recordkeeping Services, LLC ("Ascensus")

submits this memorandum of law in support of its objection to Plaintiff U-Nest Holdings,

Inc.'s ("U-Nest") Emergency Motion for Preliminary Injunction alleging breach of a

November 27, 2019 Settlement Agreement.  For the reasons set forth below, U-Nest's

Emergency Motion lacks any merit.  The Court should deny the motion.

**I.       INTRODUCTION**

U-Nest, an app creator and Financial Advisor, brings this motion for

extraordinary relief, seeking six months of continued access to Rhode Island's 529

CollegeBound saving program ("Rhode Island Program") after agreeing only two weeks

earlier to terminate its access on December 31, 2019.  Displaying "buyer's remorse," U-

Nest floats the flimsiest of theories to evade the consequences of its own multiple

failures.  First U-Nest violated its Selling Agreement in Rhode Island and lost access to

that program. Then, U-Nest botched the roll over into New York so badly that JPMorgan

Distribution Services, Inc. ("JPM"), the distributor of the New York 529 CollegeBound

Fund ("New York Program"), gave U-Nest the boot too, terminating its Selling Agreement with U-Nest. After writing an app that synchronizes with only two state programs, U-Nest managed to be tossed out of both. U-Nest is solely responsible for the predicament in which it finds itself.

U-Nest, in two short months, breached not one but two Selling Agreements, in both Rhode Island and New York, and thereby forfeited its right to access those programs as a Financial Advisor. U-Nest is not contesting those terminations, and it seeks no relief here to reverse either termination. Nor is U-Nest's demand for an extension of its access in Rhode Island predicated on some claim that it will recover its Selling Agreement – it released any such claim.

In the face of the Settlement Agreement, U-Nest's demand for extended access to the Rhode Island Program based on its allegations that Ascensus either: (1) failed to cooperate or (2) persuaded JPM to terminate the Selling Agreement in New York without just cause. Both allegations are baseless.

First, the programs only grant direct access to Financial Advisors holding Selling Agreements. U-Nest forfeited that access in Rhode Island through its own negligence. U-Nest has no continued right to access under the rules of the Rhode Island Program, and U-Nest does not challenge that determination. Thus, U-Nest has no legal claim to access after year's end, and the Court should not create such a right, particularly when it is untethered to any legal theory that would restore access.

Second, the more recent actions occurring in the New York Program do not and cannot extend access in the Rhode Island Program. They are entirely separate programs sponsored and run by their States through agents employed by those States. Ascensus'

status as a Program Manager in both states does not merge the two programs.  U-Nest

lost its Selling Agreement in Rhode Island, it asserts no theory to reclaim it, and it

therefore will lose any right to access the Rhode Island Program on December 31, 2019,

regardless of what happened in New York.

Third, Ascensus did not breach the parties' Settlement Agreement.  That

Agreement required Ascensus to maintain U-Nest's direct access to the Rhode Island

Program through December 31, 2019.  It has done so and continues to do so, and there is

no claim by U-Nest – none – that Ascensus denied or hindered its Rhode Island account

access at any time.

Fourth, U-Nest's suggestion that by cancelling one phone call Ascensus somehow

breached the Settlement Agreement and caused the U-Nest debacle in New York is

groundless for multiple reasons.  First, Ascensus cancelled and offered to reschedule the

call because it understood that JPM was about to advise U-Nest that the U-Nest New

York accounts would be frozen and new accounts would not be accepted.  Ascensus

determined that it would be senseless to conduct a call intended to discuss mechanics for

rolling accounts out of Rhode Island and into New York given JPM's determination.

Ascensus offered to speak with U-Nest after it heard from JPM, and Ascensus did just

that.  Second, the intended purpose of the original call--discussing the mechanics in

rolling accounts out of Rhode Island--proved unnecessary. U-Nest demonstrated great

facility even before the call in the mechanics of rolling accounts out of Rhode Island

since it quickly rolled out dozens.  It exhibited considerably less facility in complying

with anti-fraud measures when it opened new accounts in New York.  The lack of

cooperation claim is a canard.

Fifth, U-Nest – not Ascensus nor JPM – created its own debacle in New York. The accounts U-Nest rolled into or opened in New York triggered multiple potential fraud alerts including:

- Account owners with criminal records, including convictions for forgery, theft, embezzlement and other crimes.

- Bank account information on some Enrollment Forms for bank accounts not owned by their account owners, in direct violation of the Section 10(c) of the Enrollment form in the New York Program.

- Failed electronic bank transfers for insufficient funds.

- Customer identification issues:

  o Names, date of birth, social security numbers, and telephone numbers that did not match.

  o Social security numbers that appeared random.

  o Addresses that appeared fraudulent.

JPM terminated the Selling Agreement for good reason based on these multiple indicators of potential fraud. These failures belong to U-Nest; it brought about its own crisis by violating the rules that protect 529 accounts and regulate Financial Advisors. Ascensus did not and could not waive these fundamental rules for U-Nest.

Sixth, U-Nest's "conspiracy" theory that Ascensus poisoned U-Nest's only other option after Rhode Island – New York – fails for multiple reasons: 1) Ascensus did not know that U-Nest wrote an app that only worked in programs managed by Ascensus in Rhode Island and New York; 2) Ascensus did not know that U-Nest would roll over its accounts to New York until it started to occur; 3) Ascensus did not know that U-Nest would ignore the anti-fraud rules and trigger potential fraud alerts in the New York Program that would result in JPM's termination of the Selling Agreement; and 4)

Ascensus fulfilled its obligations as program manager in New York and did not step outside its role to harm U-Nest.

Finally, neither U-Nest nor its customers will suffer irreparable harm without an extension of U-Nest's access beyond December 31, 2019 in Rhode Island. Those customers will continue to enjoy the same rights as millions of other program customers who access the Ascensus-run 529 programs directly rather than through a Financial Advisor. And U-Nest remains free after December 31, 2019 to continue to advise those customers regarding transactions within the program.

In short, U-Nest is not entitled to emergency relief to force a six-month extension of a critical date in the Settlement Agreement that it agreed to and now apparently is unhappy about, all based on nothing more than smoke and mirrors. U-Nest has no likelihood of success on the merits and will not suffer irreparable harm if the Court denies the emergency motion for mandatory injunctive relief.[1]

## II.    FACTS

### A.    The Rhode Island Program

The Rhode Island Program is a qualified tuition program governed by Section 529 of the Internal Revenue Code of 1986, as amended, sponsored by the State of Rhode Island and administered by the Rhode Island Office of the General Treasurer. Declaration of Edwin Twomey at ¶ 2 ("Twomey Dec."). Ascensus Broker Dealer Services, LLC ("ABD") is the program manager for the Rhode Island Program pursuant

---

[1]    Indeed, it appears that U-Nest is not entitled to file this lawsuit or seek injunctive relief since it has failed to obtain a certificate of authority as a foreign corporation, in violation of R.I. Gen. Laws § 7-1.2-1418, which requires such a certificate for a foreign corporation to sue in Rhode Island. A check of the Rhode Island Secretary of State's office shows no evidence of any such certificate for U-Nest. http://business.sos.ri.gov/CorpWeb/CorpSearch/CorpSearch.aspx (search portal).

to a Program Management Agreement with the Treasurer dated March 18, 2016 (the "RI Management Agreement"). *Id.* at ¶ 3. Invesco Distributors, Inc. ("Invesco") acts as the distributor for the RI Program. *Id.* at ¶ 4.

**B.     Invesco Terminates U-Nest and Litigation Ensues**

On or about May 7, 2018, U-Nest and Invesco entered into an Agreement for Recommending 529 Plan Securities (the "RI Selling Agreement"). *Id.* at ¶ 5 & Exh. 1. However, by letter dated October 31, 2019, Invesco – not Ascensus – notified U-Nest that it was terminating the Selling Agreement effective November 30, 2019 (the "RI Termination Letter"). *Id.* at ¶ 6 & Exh. 2. The RI Termination Letter stated that Invesco was terminating U-Nest because U-Nest used Invesco's name in its marketing materials, including its website and digital application description, without Invesco's advanced written consent, in violation of the RI Selling Agreement. Exh. 2. U-Nest later conceded the violation, one of many self-inflicted wounds. U-Nest Memo. at p. 8 & n.6.

Unhappy with the termination, U-Nest ran to Rhode Island Superior Court, filing suit against both Invesco and Ascensus in the case captioned *U-Nest Holdings, Inc. v. Invesco Distributors, Inc. and Ascensus College Savings Recordkeeping Services, LLC*, No. PC-2019-11342 (the "Litigation"). Twomey Dec. at ¶ 7. The parties quickly entered into the Settlement Agreement and Release dated November 27, 2019 ("Settlement Agreement") that resolved the Litigation. Twomey Dec. at ¶ 8; U-Nest Memo. at Exh. A.[2]

---

[2]     U-Nest has repeatedly violated the confidentiality and non-disclosure restriction in Section 12 of the Settlement Agreement by filing it publicly with both the federal and state courts and not under seal. It is attached to the U-Nest motion filed here. Ascensus has requested that U-Nest file the Settlement Agreement under seal.

Under the Settlement Agreement, the parties agreed that:  1) the RI Selling Agreement would terminate on November 30, 2019; 2) U-Nest would not open any new accounts in Rhode Island; 3) U-Nest's rights to continue to access account information for those accounts where U-Nest was listed as the Financial Advisor would continue up to through December 31, 2019, at 11:59 p.m. EST and terminate on January 1, 2020. *Id.* at ¶ 9; U-Nest Memo. at Exh. A (Settlement Agreement at §§ 1-4).  After January 1, 2020, Ascensus or the State of Rhode Island could send any remaining Rhode Island account holders information about staying in the Rhode Island Program without U-Nest.  U-Nest Memo. at Exh. A (Settlement Agreement at § 4).  U-Nest also agreed to revise its inappropriate disclosures concerning Invesco noted in the Termination Letter.  U-Nest Memo. at Exh. A (Settlement Agreement at § 5).

The parties not only dismissed the lawsuit with prejudice, but also signed broad, general releases.  Twomey Dec. at ¶ 9; U-Nest Memo. at Exh. A (Settlement Agreement at §§ 7-9).  As a result of the breadth of the releases, U-Nest cannot ground any claim in this case on any alleged conduct by Ascensus before November 28, 2019.

Finally, the parties agreed also to a limited cooperation provision to effectuate the terms of the Settlement Agreement.  In particular, the parties agreed to "continue to fulfill any *existing* obligations of good faith and fair dealing in their interactions and cooperate *regarding the RI program* through December 31, 2019."  Twomey Dec. at ¶ 28; U-Nest Memo. at Exh. A (Settlement Agreement at § 13) (emphasis added).  If U-Nest or U-Nest end users requested information regarding the end-user's account up to December 31, 2019, Ascensus would simply follow its usual business practices in responding.  U-Nest Memo. at Exh. A (Settlement Agreement at § 13).  Contrary to U-Nest's suggestion,

7

there is nothing in the Settlement Agreement that obligates Ascensus to:  1) assist U-Nest in identifying another state's program to roll over accounts, 2) coach U-Nest in complying with anti-fraud measures, or 3) look the other way when U-Nest failed to comply with basic anti-fraud obligations.

Ascensus has fully complied with its obligation to keep in place U-Nest's rights to continue to access account information from the Rhode Island Program for its Rhode Island accounts and has not hindered that access in any manner.  Twomey Dec. at ¶ 27. Ascensus and Invesco agreed to allow U-Nest to maintain access to the QuickView system through December 31, 2019 so it could roll over accounts.  *Id.*  Ascensus has maintained that access unhindered.[3]  *Id.* at ¶ 11.  At no time has U-Nest complained that Ascensus failed to fulfill its obligation to keep account access open.

Equally important, even after QuickView access ends, U-Nest's account owners will still have the ability to conduct *all* account transactions and account maintenance functions, including rollovers to other 529 plans.  *Id.* at ¶ 30.  U-Nest as a Financial Advisor will remain free to assist their account owners in carrying out those functions as well.  *Id.*

C.    **The New York Program and Anti-Fraud Obligations**

Pursuant to a Management Agreement dated February 27, 2012, as amended ("Management Agreement"), ABD acts as the program manager and JPM acts as the distributor for the New York Program.  *Id.* at ¶ 12.  Ascensus and JPM have entered into an Amended and Restated Operational Agreement dated July 1, 2014 ("Operational Agreement").  *Id.*

---

[3]    After the initial conference with the Court and after consulting with the State of Rhode Island, Ascensus has continued U-Nest access through January 10, 2020, to give the Court a reasonable opportunity to decide the request for emergency relief.

Ascensus' role as program manager is regulated by the terms of the Operational

Agreement and anti-fraud and anti-money laundering programs required by the USA

Patriot Act of 2001 ("AML Procedures"), the regulations administered by the U.S.

Department of Treasury's Office of Foreign Assets Control thereunder and other

applicable U.S. fraud and anti-money laundering laws, statutes and regulations (the

"AML Laws").[4] The AML Laws require Ascensus to adopt and enforce policies,

procedures and internal controls reasonably designed to achieve compliance with the

Bank Secrecy Act and its implementing rules. *Id.* at ¶¶ 1, 13; *see also* 12 U.S.C. § 1951

*et. seq.*; 31 U.S.C. § 5311 *et seq.* ("It is the purpose of this subchapter (exception section

5315) to require certain reports or records where they have a high degree of usefulness in

criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence

or counterintelligence activities, including analysis, to protect against international

terrorism."); 31 C.F.R. Chapter X.[5] And pursuant to Section 6.7(c) of the Operational

Agreement, JPM must cooperate with Ascensus to help facilitate compliance with the

AML Laws.  Twomey Dec. at ¶ 13 and Exhibit 3, Section 6.7(c) ("The JP Morgan Parties

---

[4]   *See e.g.*, https://www.fincen.gov/resources/statutes-regulations/usa-patriot-act (Section 352 of the USA Patriot Act requires "financial institutions to establish anti-money laundering programs, which at a minimum must include: the development of internal policies, procedures and controls; designation of a compliance officer; an ongoing employee training program; and an independent audit function to test programs.").

[5]   *See also* https://www.fincen.gov/resources/statutes-regulations/fincens-mandate-congress ("The Currency and Foreign Transactions Reporting Act of 1970 (which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA") requires U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering. Specifically, the act requires financial institutions to keep records of cash purchases of negotiable instruments, file reports of cash transactions exceeding $10,000 (daily aggregate amount), and to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities. It was passed by the Congress of the United States in 1970. The BSA is sometimes referred to as an "anti-money laundering" law ("AML") or jointly as "BSA/AML." Several AML acts, including provisions in Title III of the USA PATRIOT Act of 2001, have been enacted up to the present to amend the BSA. (See 31 USC 5311-5330 and 31 CFR Chapter X [formerly 31 CFR Part 103]").

agree to cooperate with [Ascensus Investment Advisors, LLC] to help facilitate compliance with Applicable Legal Requirements for the above-referenced matters.").[6]

JPM and Ascensus each have the right to freeze accounts or suspend account services when fraud is suspected pursuant to the section entitled "Account Restrictions" of the primary disclosure document of the New York Program, the Advisor-Guided Plan Disclosure Booklet and Tuition Savings Agreement dated August 2018 ("Plan Disclosure Document"). Twomey Dec. at ¶ 15 and Exhibit 4, at page 8. Pursuant to the same section, both Ascensus and JPM have the right to reject a contribution to the New York Program for any reason, including contributions that they believe are not in the best interests of the Program or its Account Owners.  Twomey Dec. at ¶ 15 and Exhibit 4.[7]

Ascensus' AML Procedures include, among other things, monitoring for unusual activity. *Id*. at ¶ 16. When Ascensus or a distributor like JPM identifies unusual activity, Ascensus looks for signs of potential fraud or other significant irregularities. *Id*. Many different factors can constitute unusual activity, including a large number of transactions

---

[6]    Moreover, Financial Industry Regulatory Authority ("FINRA") Rule 3310 sets forth required minimum standards for registered brokers and broker-dealer firms' written AML compliance programs. *See e.g., Securities and Exchange Commission v. Alpine Securities Corp.*, 308 F.Supp.3d 775, 795, 809 (S.D.N.Y. 2018) ("FINRA Rule 3310 currently governs its members' AML programs. . . . Rule 3310 requires member firms to have a written AML policy that receives approval from FINRA's senior management and that '[e]stablish[es] and implement[s] policies, procedures, and internal controls reasonably designed to achieve compliance with the Bank Secrecy Act and the implementing regulations thereunder.'"); 31 U.S.C. 5318(g).  FINRA is an independent, nongovernmental organization that writes and enforces the rules governing registered brokers and broker-dealer firms in the United States with the objective to safeguard the investing public against fraud and bad practices. Twomey Dec. at ¶ 14.  FINRA governs JPM and Invesco, acting as distributor of New York and Rhode Island, respectively. *Id*.  With respect to the New York and Rhode Island plans, Ascensus acts as program manager and record keeper and it has contractual relationships to JPM and Invesco that require it to implement AML programs. *Id*.  U-Nest acts as a registered investment advisor under SEC rules and it must implement an AML program pursuant to its contracts with JPM and Invesco. *Id*.

[7]    "Account Restrictions.  In addition to rights expressly stated elsewhere in this Disclosure Booklet, we reserve the right to: (1) freeze an Account and/or suspend Account services when the Program has received reasonable notice of a dispute regarding the assets in an Account, including notice of a dispute in Account ownership or when the Program reasonably believes a fraudulent transaction may occur or has occurred; . . . and (5) reject a contribution for any reason, including contributions for the Advisor-Guided Plan that JPMDS, the Program Manager or the Program Administrators believe are not in the best interests of the Advisor-Guided Plan, a Portfolio or the Account Owners." (Exhibit 4 at page 8).

in a short period, or a number of attempted transactions with documents that are incomplete or that otherwise contain material errors, *i.e.*, Not In Good Order ("NIGO"). *Id.*

**D.      U-Nest's Rollovers to New York Result in Anti-Fraud Red Flags**

Shortly after signing the Settlement Agreement, U-Nest – without informing Ascensus – began the process of rolling over accounts from the Rhode Island Program to the New York Program.  Twomey Decl. at ¶ 17.[8]  U-Nest quickly rolled dozens of accounts into the New York Program without assistance from Ascensus.  *Id.* U-Nest managed the mechanics seamlessly; but U-Nest immediately encountered problems arising from information included on the new account forms.  *Id.*

REDACTED

---

[8]      On December 2, 2019, Ascensus' counsel informed U-Nest's counsel where to find help regarding the mechanics of roll overs: "U-Nest can obtain more information on the plan website at https://www.invesco.com/college-bound-529-plan/ It can also call the plan service center at (877) 615-4116 for assistance.  The call center representatives should be able to assist.  More information regarding rollovers can also be obtained by viewing the Plan's Program Description available on the plan website above.  U-Nest should be able to navigate rollovers w/ these resources."  U-Nest Memo. at Exh. C-2.

REDACTED

Ascensus processes new accounts when they come into the New York Program, identifies any NIGO accounts, and then sends that information to JPM. *Id.* at ¶ 18. JPM addresses NIGO accounts and decides how to handle such accounts. *Id.* On December 3, 2019, in accordance with Section 6.7(c) of the Operational Agreement, JPM contacted a Senior Fraud Investigator at Ascensus about the number of NIGO cases related to U-Nest within the New York Program. *Id.* To carry out its obligations under the AML Laws and the Account Restriction section of the Plan Disclosure Document, JPM asked Ascensus to investigate the NIGO accounts and report back. *Id.* Ascensus had a corresponding obligation to investigate. *Id.*

In the course of its investigation, using its normal review criteria for identifying possible fraud and unusual activity, Ascensus identified numerous potentially fraudulent accounts opened by U-Nest in New York. *Id.* at ¶¶ 19, 20. The issues with these accounts included, among others:

- Account owners with criminal records, including convictions for forgery, theft, embezzlement and other crimes.

- Bank account information on some Enrollment Forms for bank accounts not owned by their account owners, in direct violation of the Section 10(c) of the Enrollment form in the New York Program.

- Failed electronic bank transfers for insufficient funds.

- Customer identification issues:

- o   Names, date of birth, social security numbers, and telephone numbers that did not match.

- o   Social security numbers that appeared random.

- o   Addresses that appeared fraudulent.

*Id.* at ¶ 20.

Moreover, on December 5, 2019, the Ascensus processing team reviewing the rollover forms sent by U-Nest, as part of their normal procedures, noticed that the account owner signatures on the forms appeared to be exact duplicates of the signatures appearing on the Rhode Island enrollment forms. *Id.* at ¶ 22. This led the team to suspect that the same digital signature had been copied several times onto different documents during two different points in time. *Id.*

On the morning of December 5, 2019, as requested and as required by the Operational Agreement, Ascensus reported its analysis to JPM. *Id.* at ¶ 23. Later that same day by email, JPM directed Ascensus to stop opening U-Nest accounts in New York and to freeze all existing accounts. *Id.*[9] Additionally, JPM indicated that it was meeting internally on December 6, 2019 to determine next steps with the Selling Agreement with U-Nest. *Id.* According to U-Nest, later that day U-Nest received a phone call from JPM stating that it would not allow U-Nest to roll over Rhode Island accounts into the New York Program, that all current accounts were being "frozen," and that it would terminate U-Nest's Selling Agreement with the New York Program. U-Nest Memo at 10-11. According to U-Nest, JPM informed U-Nest that the termination

---

[9]   Later, on or about December 12, 2019, JPM notified Ascensus that one of the accounts that had not been flagged as potentially fraudulent turned out to be a case of identity theft as a caller had contacted JPM to report that she had seen a suspicious withdrawal from her bank account that she did not recognize or authorize. *Id.* at ¶ 24.

resulted from concern that U-Nest was "high risk." *Id*. at 11.[10] JPM refused to

reconsider its termination decision and sent written notice dated December 6, 2019,

terminating U-Nest effective January 6, 2020. *Id*.

Ascensus management did not instruct JPM to terminate its Selling Agreement

with U-Nest, and no Ascensus personnel issued such a directive or otherwise encouraged

JPM to watch out for and investigate U-Nest accounts before they rolled over into New

York. Twomey Dec. at ¶ 25. Ascensus did not even know that U-Nest intended to roll

its Rhode Island accounts into New York. *Id*. Ascensus does not have the authority to

direct the termination of any selling agreement—that is an agreement between the

distributor and an FA. *Id*. Responsibility for the selling agreements resides with the

distributor, in this case JPM for the New York Program. *Id*. Ascensus appropriately

fulfilled its contractual and legal duty as Program Manager to notify JPM of NIGO

accounts.

In short, U-Nest failed to comply with fundamental federal and New York

Program rules when it sought to create new enrollments and roll over accounts from

Rhode Island into the New York Program. *Id*. at ¶ 26. As a result, JPM terminated the U-

Nest Selling Agreement on good grounds. U-Nest's decision not to contest that

termination is a tacit admission that good cause supports the termination.

E.      **U-Nest's Claim of an Ascensus "Conspiracy" Is Baseless**

Though U-Nest claims that Ascensus orchestrated a scheme, working with JPM,

to thwart the rollovers to the New York Program, U-Nest claims are imaginary at best.

---

[10]   U-Nest seeks to excuse the fraudulent nature of its accounts by characterizing them as "a small handful of U-Nest accounts." U-Nest Memo. at 11. The volume and nature of these AML issues suggest a reckless disregard for the rules and regulations that govern U-Nest and all FAs.

U-Nest offers no evidence of such a "conspiracy" and there is none. U-Nest offers speculation and conjecture, but the facts are detailed above.

Nor can U-Nest credibly claim that somehow Ascensus breached the limited "cooperation" provision in the Settlement Agreement.  To the contrary, Ascensus did not agree in the Settlement Agreement or otherwise that it would or could alter the rules that govern accounts and programs in other states to accommodate or to assist U-Nest in its rollover process.  *Id.* at ¶ 27.  U-Nest, like all Financial Advisors, must comply with the rules of these 529 programs administered by the individual states, including the State of New York.  *Id.*  Under the Settlement Agreement, Ascensus and U-Nest merely agreed to "fulfill any *existing* obligations of good faith and fair dealing in their interactions under *Rhode Island's program* through December 31, 2019." *Id.* at ¶ 28.  Ascensus did not agree to provide any assistance affecting other 529 programs, including the New York Program. *Id.*

U-Nest's lengthy description (over five pages) of a *single*, cancelled phone call on December 6, 2019 demonstrates its "conspiracy" theory is utterly lacking in merit.  While U-Nest sees bogeymen around every corner, there is a simple explanation for this particular cancelled phone call with counsel and principals of the companies.  Shortly before the call, JPM instructed Ascensus, pursuant to its authority in the Account Restriction section of the Plan Disclosure Document and Section 7.4 of the Operational Agreement, to freeze all U-Nest accounts and suspend new account openings. *Id.* at ¶ 31. Upon receipt of a suspension notice from JPM, Ascensus took the required immediate action to suspend as soon as practicable the processing of account applications. Given JPM's instructions, Ascensus decided, as is its right, to defer the call until JPM first

notified U-Nest of its actions.  *Id*.  Ascensus had hoped that JPM would notify U-Nest of

the suspension and termination of the Selling Agreement before the scheduled call, but

that did not occur.  *Id*.  When Ascensus cancelled the call, it informed U-Nest it would

receive notification from JPM, and Ascensus offered to talk <u>after</u> U-Nest received that

notification.  *Id*.  Not having the call did not prevent U-Nest from rolling over accounts

from Rhode Island; in fact, it had already rolled over dozens of accounts.  After the

notification, U-Nest and Ascensus did have an extended call and discussed the situation.

*Id*.

### F.    U-Nest's Vague "SEC Non-Compliance" Allegation Is Nonsense

In a last ditch effort to gin up a claim, U-Nest spends considerable time alleging

that Ascensus falsely accused U-Nest of having "SEC irregularities" or "SEC problems,"

including an apparent comment by Ascensus' counsel in a courtroom hallway or via

hearsay from the Rhode Island Treasurer's office.  U-Nest argues that the SEC's

examination or audit which culminated in May 29, 2019 (and U-Nest's corrective action

of deficiencies ultimately accepted on June 27, 2019) somehow demonstrates that U-

Nest's actions in New York complied with all legal requirements.[11]

U-Nest's contention is both a non-sequitur and beside the point.  The SEC

determination is dated May 29; the relevant New York actions occurred some six months

later. Obviously, the SEC did not review U-Nest's recent actions in New York. The SEC

report certainly does not address the significant anti-fraud "red flags" detailed earlier in

---

[11]    Among the deficiencies the SEC identified was U-Nest's failure to adopt compliance policies and procedures demonstrating U-Nest's cavalier attitude toward compliance.  Further, contrary to U-Nest's contention, the SEC did not clear U-Nest.  The SEC letter itself says: "You should not conclude that any of the firm's activities not discussed in Exhibit A are in full compliance with the federal securities laws.  Nor should you conclude that Exhibit A sets forth an exhaustive list of the ways in which the firm's activities do not comply with the federal securities laws."  U-Nest Memo. at Exh. C-6.

this memorandum that occurred after November 27, 2019, the date of the Settlement
Agreement.  What the SEC determined about U-Nest's conduct months earlier says
nothing about the problems of U-Nest's own making in rolling over accounts to the New
York Program.  Further and more specifically, in the context of a discussion between
lawyers concerning this dispute Ascensus' counsel accurately pointed out to U-Nest
counsel that his client failed to comply with the AML rules.

## III.   PRELIMINARY INJUNCTION STANDARDS

There are three issues that the Court must address when deciding whether to grant
a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.  First, the
moving party must demonstrate that it has a strong likelihood of succeeding on the merits
of its claim at trial.  *Shurtleff v. City of Boston*, 928 F.3d 166, 171 & n.3 (1st Cir. 2019)
(holding that plaintiffs did not "establish a strong likelihood that they will ultimately
prevail on the merits" and noting that the "sine qua non of the four-part inquiry is
likelihood of success on the merits").  Second, the party seeking the preliminary
injunction must show that it will suffer irreparable harm which is imminent and for which
no adequate legal remedy exists to restore the plaintiff to its rightful position. *See e.g.*,
*Bennett v. Mollis*, 590 F.Supp.2d 273, 277 (D.R.I. 2008) (need to show "significant risk
of irreparable harm absent the injunction"); *Atlantic Beach Casino, Inc. v. Morenzoni*,
749 F. Supp. 38, 42 (D.R.I. 1990) (finding no adequate remedy at law for certain
constitutional harms).  It is axiomatic in equity law that a claim for monetary damages
will ordinarily not invite injunctive relief, as there is an adequate remedy at law.  *Rosen v.
Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) ("It is axiomatic that equitable
relief is only available where there is no adequate remedy at law; cases in which the

remedy sought is the recovery of money damages do not fall within the jurisdiction of equity."). Only after finding a likelihood of success on the merits and an irreparable injury should the Court balance the equities and determine whether granting the injunction is in the public interest. *See Shurtleff*, 928 F.3d at 171 & n.3 (1st Cir. 2019).

In this analysis, the Court should recognize that "the traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Basinger v. City of Richmond*, 2014 WL 12570950 at *1 (E.D. Va. Aug. 28, 2014). The Court must deny a preliminary injunction when the moving party fails to meet the requirements set forth above by a clear showing. *See Assoc. of Community Organizations for Reform Now v. Town of East Greenwich*, 453 F.Supp.2d 394, 399 (D.R.I. 2006) ("The Supreme Court has said that 'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carriers the burden of persuasion.") (emphasis in original). For instance, if the moving party fails to establish a likelihood of success on the merits, the Court's analysis ends there without any need to consider a balance of the equities. *Shurtleff*, 928 F.3d at 171 & n.3.

Finally, a preliminary injunction, particularly a mandatory preliminary injunction, is an "extraordinary remedy." *Talbert v. Correctional Dental Associates*, 2019 WL 6460499 at *2 (E.D. Pa. Nov. 29, 2019) ("A mandatory preliminary injunction is an extraordinary remedy which courts should grant sparingly."). When a preliminary injunction is mandatory in nature – in that it commands action from a party rather than preventing action – a stricter rule applies and such injunctions should be issued only upon

a showing by clear and convincing evidence that "the preliminary injunction [is] the only

way of protecting the [him] from harm." *Id.*; *Harlem Algonquin LLC v. Canadian*

*Funding Corporation*, 742 F.Supp.2d 957, 960 (N.D. Ill. 2010) ("Mandatory preliminary

injunctions, which require the defendant to take some affirmative action, represent an

even more extraordinary remedy.  They are 'cautiously viewed and sparingly issued,'

such that only 'the clearest equitable grounds' will justify the remedy.") (internal

citations omitted).

## IV.   <u>ARGUMENT</u>

U-Nest's wild accusations do not satisfy the stringent standards for what amounts

to a request for *mandatory* injunctive relief, requiring Ascensus to:  1) rewrite and extend

for an additional six months the December 31, 2019 access deadline in the Settlement

Agreement; 2) grant U-Nest access for that extended period to accounts currently opened

with the Rhode Island Program, and 3) identify a state with a 529 plan that it manages

other than Rhode Island or New York "to which it is willing to ultimately allow U-Nest

to roll its current RI Program and NY Program accounts for a longer period of time –

such as a full year, subject to Court oversight – in order for U-Nest to find a permanent

plan in which these accounts can be invested."[12]

U-Nest's request for relief is breathtaking and unprecedented in its scope.  U-Nest

asks this Court to effectively renegotiate the Settlement Agreement it signed only weeks

ago and adopt and implement a new business plan for U-Nest that requires Ascensus to

welcome U-Nest into a new plan[13] somewhere in the United States, all without the

---

[12]    U-Nest also seeks several outlandish discovery orders that the Court should not even consider at this stage.

[13]    And what happens if U-Nest again seeks to rollover accounts that raise potential fraud alerts and the new distributor again rejects the U-Nest accounts?  U-Nest's proposal is unworkable.

consent or approval of the State that actually owns and administers the program or the distributor.[14] And U-Nest demands this immediate relief (indeed, more than immediate relief) on the barest of allegations and claims based on hyperbole and suspicions.  U-Nest lacks any clear right to this extraordinary relief.

### A.   U-Nest Lacks a Reasonable Likelihood of Success on the Merits

Despite tossing around hyperbolic allegations like "defamation" and "bad faith" and "malicious and nefarious acts," U-Nest's complaint boils down to a single breach of contract claim (and a tag-along, unexplained claim for breach of the implied covenant of good faith and fair dealing).[15]  The upshot of its claim, expressed in a single page of its motion, is that Ascensus allegedly failed to comply with the limited cooperation provision in the Settlement Agreement by refusing to facilitate U-Nest's rollover of its Rhode Island Program accounts and actively working to prevent U-Nest from being able to roll over those accounts into New York.  U-Nest misstates the facts and badly misreads the Settlement Agreement.

As demonstrated above, in Section 13 of the Settlement Agreement the parties agreed to a limited cooperation provision to implement the terms of the Settlement Agreement.  In particular, the parties agreed to "continue to fulfill any *existing* obligations of good faith and fair dealing in their interactions and cooperate *regarding the RI program* through December 31, 2019."  (emphasis added).  Contrary to U-Nest's suggestion, there is nothing in the Settlement Agreement that obligates Ascensus to: 1) assist U-Nest in identifying another state's program to roll over accounts, 2) coach

---

[14]   U-Nest claims that it understands Ascensus has about 65-66% of the states under management.  That is untrue as explained in Mr. Twomey's Declaration at ¶ 32 & n.1.

[15]   U-Nest also has a count for "injunctive relief," but that is a remedy, not an independent cause of action.  *Doe v. Brown University*, 166 F.Supp.3d 177, 197 (D.R.I. 2016) ("[A] claim for injunctive relief is not a stand alone cause of action.").

U-Nest in rolling over accounts to another state, or 3) look the other way when U-Nest

fails to comply with basic anti-fraud obligations.

Ascensus has fully complied with its obligation to keep in place U-Nest's rights to

continue to access account information from the Rhode Island Program for its Rhode

Island accounts and has not hindered that access in any manner. Twomey Dec. at ¶¶ 25-

30. Ascensus maintained U-Nest access to the QuickView system, and it continues to

allow that access to U-Nest. *Id.* U-Nest does not contend that Ascensus failed to fulfill

its obligation to keep account access open.

Ascensus' cancellation of a single, voluntary phone call did not breach the

Settlement Agreement and it did not create the dilemma of which U-Nest now

complains.[16] Ascensus cancelled and offered to reschedule the call because it understood

that JPM was about to—within hours—advise U-Nest that it decided to freeze the U-Nest

New York accounts and would not accept any new accounts. Ascensus believed,

appropriately, that it would be senseless to conduct a call intended to discuss mechanics

for rolling accounts out of Rhode Island and, at this point, presumably into New York,

given JPM's determination. Ascensus offered to speak with U-Nest after it heard from

JPM, and Ascensus did just that on December 11, 2019.[17]

More importantly, the dilemma that U-Nest complains of here has nothing to do

with Ascensus' compliance with the access requirement or with cooperation; it springs

---

[16]  Ascensus, through its counsel, did provide some assistance to U-Nest regarding the mechanics of
rollovers. U-Nest Memo. at Exh. C-2. As early as December 2, 2019, Ascensus informed U-Nest: "U-Nest
can obtain more information on the plan website at https://www.invesco.com/college-bound-529-plan/ It
can also call the plan service center at (877) 615-4116 for assistance. The call center representatives should
be able to assist. More information regarding rollovers can also be obtained by viewing the Plan's Program
Description available on the plan website above. U-Nest should be able to navigate rollovers w/ these
resources." *Id.*

[17]  U-Nest's self-serving and unsupported assertions about Ascensus' motives and its consideration of
U-Nest's "proposals" – resulting in allegations of Ascensus "running out the clock" or engaging in a "rope-
a-dope" – are hyperbole masquerading as fact lacking any evidentiary support or significance.

from the fact that U-Nest wrote an app that only works with two state programs <u>and</u>

U-Nest caused the termination of its Selling Agreement in both programs within 60 days.

It is U-Nest's obligation to roll over the accounts and it showed great facility in

doing so. However, in doing so U-Nest did not comply with anti-fraud measures.

Therefore, the claim of lack of cooperation is groundless.[18]

Finally, U-Nest's claim that Ascensus breached the Settlement Agreement by

actively working to prevent U-Nest from rolling over the Rhode Island accounts is

baseless. First, there is no evidence that Ascensus conspired with JPM; U-Nest offers

only rank conjecture while Ascensus presents evidence refuting the claim. Second, the

facts demonstrate that U-Nest failed in New York because it presented accounts that

triggered multiple anti-fraud alerts. U-Nest asks this Court to turn a blind eye to the

multiple anti-fraud red flags that both Ascensus and JPM identified and that ultimately

prompted JPM to terminate U-Nest. As detailed earlier, both the law and the program

documents required JPM and Ascensus to flag and report those potentially serious

problems. U-Nest has no response other than to put its head in the sand and pretend they

never happened.

Further, and just as critically, U-Nest must demonstrate that it has a likelihood of

success that it will achieve in court the result it seeks. *See e.g., Rhode Island Homeless*

*Advocacy Project v. City of Cranston*, 2017 WL 3327573 at *1 (D.R.I. Aug. 3, 2017)

(Smith, J.) ("The first prong is absolutely necessary; without establishing a strong

likelihood of prevailing on the merits as opposed to a mere possibility of success, the

other prongs are irrelevant."). But U-Nest's request for relief is untethered to its contract

---

[18]   Of equal ilk is U-Nest's claim for attorneys' fees arising from Ascensus' alleged breach of the
Settlement Agreement and in connection with the emergency motion. There is no basis for such a claim
either under the Settlement Agreement or under Rhode Island law.

claims. *See Bucklew v. St. Clair*, C.A. 18-CV-2117-N, 2019 WL 2251109, at *3 (N.D.

Tex. May 15, 2019) (request for injunctive relief must be tethered to claims in

complaint), *adopted*, 2019 WL 2249719 (N.D. Tex. May 24, 2019).  U-Nest has no legal

claim that Invesco must restore its Selling Agreement and with it access to the Rhode

Island program [in fact it released that claim]. U-Nest has no legal claim that Ascensus

must in the future accept U-Nest into another state's program.  U-Nest presents no

contract or agreement that contains such a promise.  Indeed, the request is on its face

impractical.  Each state establishes its own 529 program, and every market participant

must meet the rules and requirements of that program.  Ascensus cannot reject a market

participant that meets those state requirements or accept one that does not; the programs

belong to the states.  U-Nest presents no likelihood of success that it will obtain a remedy

that cures its own business failings.

In short, U-Nest has no reasonable likelihood of success on its claim for breach of

the cooperation provision in the Settlement Agreement, and those claims are untethered

to the relief it seeks.[19]

### B.      U-Nest Will Not Suffer Irreparable Harm

Without a likelihood of success of the merits of his claim, the Court's analysis is

at an end. *Shurtleff*, 928 F.3d at 171 & n.3. Further, U-Nest cannot show it will suffer

irreparable harm without an extension of U-Nest's access beyond December 31, 2019 in

Rhode Island.  Even assuming U-Nest has standing to raise its own customers' interests,

U-Nest's customers will continue to enjoy the same rights as the millions of other

program customers who access 529 programs directly rather than through a Financial

---

[19]    Without a viable breach of contract claim, there can be no claim for breach of the implied covenant of good faith and fair dealing. *Viera v. Bank of Newport Mellon*, C.A. No. 17-0523-WES, 2018 WL 4964545, at *3 (D.R.I. Oct. 12, 2018).

Advisor.  And U-Nest is free to continue to advise those customers regarding transactions within the program.  Further, if U-Nest customers prefer to act through a Financial Advisor with direct access, they can choose another advisor that has not breached and forfeited its Sellers Agreement.  The customers face no irreparable harm here.

U-Nest itself presents only a money damages claim.  Even if it could demonstrate that Ascensus breached the Settlement Agreement – and it cannot – U-Nest would have only a claim for money damages. The same rule applies to U-Nest's conspiracy claim. U-Nest presents only a claim for money damages.

U-Nest posits that the problems created by the terminations in Rhode Island and New York and the inability of its app to work with any other program could substantially harm its business.  Whether true or not, U-Nest created those problems: U-Nest wrote the app and U-Nest took the actions that resulted in termination in both states. And U-Nest is not contesting those terminations.  Alleged harm to a business is a money damages claim.

**C.**     **The Balance of Equities Favors Denial of U-Nest's Motion**

The Court need not engage in the balancing of equities since U-Nest cannot meet its high burden of showing a reasonable likelihood of success or irreparable harm.  But the equities weigh in favor of denial of U-Nest's motion in any event.

First and foremost, the public has a significant interest in the enforcement of AML Laws, and that is what happened here. *See e.g.*, Catherine Lee Wilson, *Banking on the Net: Extending Bank Regulation to Electronic Money and Beyond*, 30 Creighton L. Rev. 671, 675 (1997) ("The public policy interests in monetary control, currency creation, consumer protection, law enforcement, money laundering, safe and sound financial institutions and payment system protection make electronic money a natural

focus for regulation."). These concerns are reflected in the AML laws themselves outlined earlier in this memorandum. These laws protect the public. *See, e.g.*, 12 U.S.C. § 1951 *et seq.*; 31 U.S.C. § 5311 *et seq.* ("It is the purpose of this subchapter (exception section 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism."). The significant public interest in enforcing those AML Laws prompted JPM to terminate U-Nest. This is serious business, and rewarding U-Nest for flouting these rules is not in the public's interest and would only encourage further lapses and problems of this type.

Further, the public has a strong interest – as does this Court – in enforcing Settlement Agreements as written. *See Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988) (holding "there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into."); *Hall v. Knudsen*, 535 A.2d 772, 775 (R.I. 1988) (same). To allow U-Nest to evade the December 31, 2019 deadline in the Settlement Agreement and force Ascensus and Invesco to allow access to the Rhode Island Program for another six months severely undermines that laudable public policy. Further, the Rhode Island Program does not permit parties without a Selling Agreement to maintain direct access, and the Court should respect that rule which is also in place to protect the public.

Any alleged harm that might befall U-Nest is of its own making due to shoddy practices. U-Nest does not come to this Court seeking equitable relief with clean hands. By contrast, the Rhode Island Program would suffer significant prejudice if the Court

through an injunction overrides the rules that govern Financial Advisors.  And again,

U-Nest is not contesting its termination in Rhode Island and therefore has no legal claim

to continued direct access.  The Settlement Agreement accommodated U-Nest's request

for an additional 30 days to execute rollovers.  U-Nest failed to complete those rollovers

because it failed to comply with the AML Laws.  The consequences of that failure

rightfully fall on U-Nest, not on the state programs.

## V.      CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff U-Nest Holdings, Inc.'s

Emergency Motion for Preliminary Injunction.

> Defendant ASCENSUS COLLEGE SAVINGS
> RECORDKEEPING SERVICES, LLC
>
> By its Attorneys,
>
> */s/ David A. Wollin*
> Gerald J. Petros (#2931)
> David A. Wollin (#4950)
> Mitchell R. Edwards (#6942)
> Hinckley Allen & Snyder LLP
> 100 Westminster Street, Suite 1500
> Providence, RI  02903-2319
> T:  (401) 274-2000
> F:  (401) 277-9600
> gpetros@hinckleyallen.com
> medwards@hinckleyallen.com

Dated:  December 31, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Joseph A. Farside, Jr., Esq.
Krystle G. Tadesse, Esq.
Samantha M. Vasques, Esq.
Locke Lord LLP
2800 Financial Plaza
Providence, RI  02903
T:  (401) 274-9200
F:  (401) 276-6611
joseph.farside@lockelord.com
krystle.tadesse@lockelord.com
samantha.vasques@lockelord.com

*/s/ David A. Wollin*