UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U-NEST HOLDINGS, INC., | : |
| Plaintiff, | : |
| v. | : C.A. No. 1:19-CV-00659-WES-PAS |
| ASCENSUS COLLEGE SAVINGS RECORDKEEPING SERVICES, LLC, | : |
| Defendant. | : |

## DECLARATION OF EDWIN TWOMEY

I, Edwin Twomey, hereby depose and state:

1.  I am Chief Risk Officer of Ascensus College Savings Recordkeeping Services, LLC, Ascensus Broker Dealer Services, LLC ("ABD"), and Ascensus Investment Advisors, LLC (collectively, "Ascensus"). In this role, I am involved in the administration and oversight of anti-fraud and anti-money laundering programs required by the USA Patriot Act of 2001 ("AML Procedures"), the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control thereunder and other applicable U.S. anti-money laundering laws, statutes and regulations (the "AML Laws").

**The Rhode Island Program**

2.  Rhode Island's CollegeBound 529 is a qualified tuition program governed by Section 529 of the Internal Revenue Code of 1986, as amended, sponsored by the State of Rhode Island and administered by the Rhode Island Office of the General Treasurer (the "RI Program").

3. ABD is the program manager for the RI Program pursuant to a Program Management Agreement between the Treasurer and Ascensus dated March 18, 2016 (the "RI Management Agreement").

4. Invesco Distributors, Inc. ("Invesco") acts as the distributor for the RI Program pursuant to the Services Agreement dated June 16, 2016 among ABD, Invesco Advisers, Inc. and Invesco, as amended ("RI Operational Agreement").

5. On or about May 7, 2018, U-Nest Holdings LLC ("U-Nest") and Invesco entered into an Agreement for Recommending 529 Plan Securities (the "RI Selling Agreement"). See Exhibit 1 hereto.

6. Invesco sent to U-Nest a letter dated October 31, 2019 providing written notice that it was terminating the Selling Agreement effective November 30, 2019 (the "RI Termination Notice"). See Exhibit 2 hereto.

7. U-Nest filed suit against Invesco and Ascensus (collectively, the "Defendants") in the case captioned *U-Nest Holdings, Inc. v. Invesco Distributors, Inc. and Ascensus College Savings Recordkeeping Services, LLC*, No. PC-2019-11342 (Rhode Island Superior Court, Providence County) (the "Litigation").

8. The parties entered into a Settlement Agreement and Release dated November 27, 2019 that resolved the litigation. A true and correct copy of the Settlement Agreement is attached to U-Nest's Emergency Motion for Preliminary Injunction as Exhibit A.

9. Under the Settlement Agreement, the parties agreed that:

   a. The Rhode Island Selling Agreement terminated on November 30, 2019.

   b. U-Nest would not open any new accounts in Rhode Island.

  c. U-Nest's rights to continue to access account information for those accounts where U-Nest is listed as the Financial Advisor would continue up to and through December 31, 2019, at 11:59 p.m. EST and terminate on January 1, 2020.

Under the Settlement Agreement, the parties also dismissed the Litigation with prejudice and signed general releases.

10. U-Nest indicated it would roll over its Rhode Island accounts to different programs.

11. Pursuant to and since the Settlement Agreement, ABD has fully complied with its obligation to keep in place U-Nest's rights to continue to access account information for its Rhode Island accounts and has not hindered that access in any manner. Under the Settlement Agreement, that access is through December 31, 2019.

**The New York Program**

12. Pursuant to a Management Agreement dated February 27, 2012, as amended ("Management Agreement"), ABD acts as the program manager and JPMorgan Distribution Services, Inc. ("JPM") acts as the distributor for the New York's Advisor-Guided 529 College Savings Program ("New York Program"). Ascensus and JPM have entered into an Amended and Restated Operational Agreement dated July 1, 2014 ("Operational Agreement"). A true and correct copy of the Operational Agreement is attached hereto at Exhibit 3.

13. Ascensus' role as program manager is regulated by the terms of the Operational Agreement and the AML Laws. The AML Laws require Ascensus to adopt and enforce policies, procedures and internal controls reasonably designed to achieve compliance with the Bank Secrecy Act and its implementing rules. And pursuant to Section 6.7(c) of the Operational Agreement, JPM must cooperate with Ascensus to help facilitate compliance with the AML

Laws. *See* Exhibit 3, Section 6.7(c) ("The JP Morgan Parties agree to cooperate with [Ascensus Investment Advisors, LLC] to help facilitate compliance with Applicable Legal Requirements for the above-referenced matters.").

14. Moreover, Financial Industry Regulatory Authority ("FINRA") Rule 3310 sets forth required minimum standards for registered brokers and broker-dealer firms' written AML compliance programs. FINRA is an independent, nongovernmental organization that writes and enforces the rules governing registered brokers and broker-dealer firms in the United States with the objective to safeguard the investing public against fraud and bad practices. FINRA governs JPM and Invesco, acting as distributor of New York and Rhode Island, respectively. With respect to the New York and Rhode Island plans, Ascensus acts as program manager and record keeper and it has contractual relationships to JPM and Invesco that require it to implement AML programs. U-Nest acts as a registered investment advisor under SEC rules and it must implement an AML program pursuant to its contracts with JPM and Invesco.

15. Pursuant to the section entitled "Account Restrictions" of the primary disclosure document of the New York Program, the Advisor-Guided Plan Disclosure Booklet and Tuition Savings Agreement dated August 2018 ("Plan Disclosure Document"), JPM and Ascensus each have the right to freeze accounts or suspend account services when fraud is suspected. Pursuant to the same section, both Ascensus and JPM have the right to reject a contribution to the Program for any reason, including contributions that they believe are not in the best interests of the Program or its Account Owners. A true and correct copy of an excerpt from the Plan Disclosure Document is attached hereto at Exhibit 4 (at page 8 "Account Restrictions. In addition to rights expressly stated elsewhere in this Disclosure Booklet, we reserve the right to: (1) freeze an Account and/or suspend Account services when the Program has received reasonable notice of a

4

dispute regarding the assets in an Account, including notice of a dispute in Account ownership or when the Program reasonably believes a fraudulent transaction may occur or has occurred; . . . and (5) reject a contribution for any reason, including contributions for the Advisor-Guided Plan that JPMDS, the Program Manager or the Program Administrators believe are not in the best interests of the Advisor-Guided Plan, a Portfolio or the Account Owners.").

16.  Ascensus' AML Procedures include, among other things, monitoring for unusual activity.  When Ascensus or a distributor like JPM identifies unusual activity, Ascensus looks for signs of potential fraud or other significant irregularities.  Many different factors can constitute unusual activity, including a large number of transactions in a short period, or a number of attempted transactions with documents that are incomplete or that otherwise contain material errors, i.e., Not In Good Order ("NIGO").

17.  Shortly after signing the Settlement Agreement, U-Nest – without informing Ascensus – began the process of rolling certain accounts from the Rhode Island Program to the New York Program.  U-Nest quickly rolled dozens of accounts into the New York Program without assistance from Ascensus.  U-Nest managed the mechanics seamlessly; but U-Nest immediately encountered problems arising from information included on the new account forms.

18.  Ascensus processes new accounts when they come into the New York Program, identifies any NIGO accounts, and then sends them to JPM.  JPM addresses NIGO accounts and decides how to handle such accounts.  On December 3, 2019, in accordance with Section 6.7(c) of the Operational Agreement, JPM contacted a Senior Fraud Investigator at Ascensus about the number of NIGO cases related to U-Nest within the New York Program.  To carry out its obligations under the AML Laws and the Account Restriction section of the Plan Disclosure

Document, JPM asked Ascensus to investigate the NIGO accounts and report back. Ascensus had a corresponding obligation to investigate.

19. Ascensus' investigation at JPM's behest revealed that these accounts included bank account information on some Enrollment Forms for bank accounts not owned by their account owners in direct violation of the New York Program. Section 10(c) of the Enrollment Form specifically prohibits such bank accounts, often referred to as third party banks.

20. In the course of its investigation, Ascensus identified additional problems with a number of U-Nest accounts. Using its normal review criteria for identifying possible fraud and unusual activity, Ascensus identified numerous potentially fraudulent accounts opened by U-Nest in New York. The issues with these accounts included, among others:

- Account owners with criminal records, including convictions for forgery, theft, embezzlement and other crimes.

- Bank account information on some Enrollment Forms for bank accounts not owned by their account owners, in direct violation of the Section 10(c) of the Enrollment form in the New York Program.

- Failed electronic bank transfers for insufficient funds.

- Customer identification issues:
    - Names, date of birth, social security numbers, and telephone numbers that did not match.
    - Social security numbers that appeared random.
    - Addresses that appeared fraudulent.

21. REDACTED

REDACTED

22. Moreover, on December 5, 2019, the Ascensus processing team reviewing the rollover forms sent by U-Nest, as part of their normal procedures, noticed that the account owner signatures on the forms appeared to be exact duplicates of the signatures appearing on the Rhode Island enrollment forms. This led the team to suspect that the same digital signature had been copied several times onto different documents during two different points in time.

23. On the morning of December 5, 2019, as required and as requested by the Operational Agreement, Ascensus reported its analysis to JPM. Later that same day by email, JPM directed Ascensus to stop opening U-Nest accounts in New York and to freeze all existing accounts. Additionally, JPM indicated that it was meeting internally on December 6, 2019 to determine next steps with the Selling Agreement with U-Nest.

24. Later, on or around December 12, 2019, JPM notified Ascensus that one of the accounts we had not flagged as potentially fraudulent turned out to be a case of identity theft as a caller had contacted JPM to report that she had seen a suspicious withdrawal from her bank account that she did not recognize or authorize.

25. Ascensus management did not instruct JPM to terminate its Selling Agreement with U-Nest, and to the best of my knowledge and belief, no Ascensus personnel issued such a directive or otherwise encouraged JPM to watch out for and investigate U-Nest accounts before or as they rolled over into New York. Ascensus did not know beforehand that U-Nest intended to roll its Rhode Island accounts into New York. Ascensus does not have the authority to direct the termination of any selling agreement. Responsibility for the selling agreements resides with the distributor, in this case JPM for the New York Program.

26. In short, U-Nest failed to comply with fundamental federal and New York Program rules when it sought to create new enrollments and roll over accounts from Rhode Island into the New York Program.

27. Ascensus did not agree in the Settlement Agreement or otherwise that it would or could alter the New York Program rules that govern accounts and programs in other states to accommodate or to assist U-Nest in its rollover process. U-Nest, like all Financial Advisors, must comply with the rules of these 529 programs administered by the individual states, including the State of New York.

28. Rather, under the Settlement Agreement, Ascensus and U-Nest each agreed to continue to "fulfill any *existing* obligations of good faith and fair dealing in their interactions and cooperation regarding *Rhode Island's program* through December 31, 2019." They did not agree to provide any assistance affecting other 529 programs including the New York Program.

29. Normally, when a selling agreement terminates, account access through Ascensus' QuickView system is immediately terminated. However, as part of the Settlement Agreement that U-Nest and Ascensus signed, Ascensus and Invesco agreed to allow U-Nest to maintain access to the QuickView system through December 31, 2019 so it could roll over

8

accounts. Ascensus maintained that access unhindered. At no time has U-Nest complained that Ascensus failed to fulfill its obligation to keep account access open.

30. Even after QuickView access ends, U-Nest's account owners will still have the ability to conduct *all* account transactions and account maintenance functions, including rollovers to other 529 plans. U-Nest as a financial advisor will remain free to assist their account owners in carrying out those functions as well.

31. I understand that U-Nest takes issue with a cancelled December 6, 2019 conference call between U-Nest and Ascensus. Shortly before the call, JPM instructed Ascensus, pursuant to its authority in the Account Restriction section of the Plan Disclosure Document and Section 7.4 of the Operational Agreement, to freeze all U-Nest accounts and suspend new account openings. Upon receipt of a suspension notice from JPM, Ascensus took the required immediate action to suspend as soon as practicable the processing of account applications until further written notice reinstating the ability to offer or distribute accounts, or until the cause of the suspension notice had been cured. Given JPM's instructions, Ascensus decided to defer the call until JPM first notified U-Nest of its actions. Ascensus had hoped that JPM would notify U-Nest of the suspension and termination of the Selling Agreement before the scheduled call, but that did not occur. When Ascensus cancelled the call, it informed U-Nest it would receive notification from JPM, and Ascensus offered to talk after U-Nest received that notification. After the notification, U-Nest and Ascensus did have an extended call and discussed the situation.

32. Finally, U-Nest has asserted in court papers that Ascensus "has about 66% of the states under management." This is not accurate. Ascensus is the distributor for only one of the

31 existing advisor-sold 529 plans -- the subset of plans U-Nest appears interested in selling. That amounts to only about 3% of plans.[1]

---

[1] There is a second plan that retains some legacy advisory relationships, but this plan is not open to new advisory relationships. Ascensus is the program manager for only six of the 31 advisor-sold plans, amounting to about 19%. The total number of plans that Ascensus administers, as distributor, program manager, investment manager and/or record keeper is 13 of the 31 advisor-sold plans, amounting to 42%. Of course, the one plan for which Ascensus acts as distributor is the only plan for which Ascensus has control of the distribution arrangements. Ascensus does act as program manager, investment advisor and/or recordkeeper for a high percentage of direct-sold 529 plans, but U-Nest does not appear interested in distributing those plans. Registered investment advisors sometimes use direct-sold plans with their clients.

I declare under penalty of perjury that the forgoing is true and accurate.

_____
Edwin Twomey

Executed on December 31, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

      Joseph A. Farside, Jr., Esq.
      Krystle G. Tadesse, Esq.
      Samantha M. Vasques, Esq.
      Locke Lord LLP
      2800 Financial Plaza
      Providence, RI 02903
      T: (401) 274-9200
      F: (401) 276-6611
      joseph.farside@lockelord.com
      krystle.tadesse@lockelord.com
      samantha.vasques@lockelord.com

                                                      */s/ David A. Wollin*

59448508